Lisa DANGLER, on Behalf of her minor
son, Justin DANGLER, Plaintiff,

v.

YORKTOWN CENTRAL SCHOOLS,
John V. Doherty, Superintendent of
Schools, Michael Frischman, Principal,
Yorktown High School, sued in their
official and individual capacities, Defendants.

No. 91 Civ. 3469 (GLG).

United States District Court,
S.D. New York.

Aug. 14, 1991.

**626**

Michael H. Sussman, Goshen, N.Y., for plaintiff.

Ahmuty, Demers & McManus, Albertson, N.Y. (Michael J. Rabus, of counsel), for defendants.

## OPINION

GOETTEL, District Judge:

This case presents the question of whether a student should have been admitted to the National Honor Society chapter of his high school. As federal rights protected by both the first and the fourteenth amendment have allegedly been violated, this court must reluctantly project its opinion into a dispute distinctly within the realm of local educational authorities.

## BACKGROUND

There is no question that Justin Dangler is a bright, capable teenager. In three years at Yorktown High School, he has maintained a near "A" average. Additionally, he participates in a number of extracurricular activities including the school newspaper, the student senate, local political campaigns, and Future Business Lead-

ers of America, along with working at part-time jobs. The record contains glowing testimonials to Justin's capabilities.

As a high school junior, Justin was eligible to be considered for membership in the Yorktown High School chapter of the National Honor Society ("NHS"). To be so eligible, a student must be a junior or senior and have maintained at least a 3.5 out of a possible 4.0 average. The student's application must then be approved by a majority of the five member faculty council appointed annually by the high school principal to evaluate candidates. In addition scholarship, "[s]election ... is based on outstanding *character, leadership,* and *service.*" Constitution of the Yorktown High School National Honor Society, Article VII, § 1 (emphasis in original). In addition, the Bylaws of the Yorktown Chapter state that "[t]he National Honor Society exemplifies the qualities of honor and character" and specifically state that a student is ineligible if he or she does not exhibit exemplary character, has been caught cheating or flagrantly violating school rules. These guidelines make clear that character should be heavily weighted in the assessment of a student by the faculty council.

Justin, possessing a 3.93 average, applied for membership in the NHS. His application was denied although no reason was initially provided. The rejection letter, written by the advisor to the NHS, advised him that he would eligible for consideration again in the Fall of 1991 and urged that he "strive to attain a high quality of character, leadership and service." He was invited to contact the advisor with any questions. Letter from Kathy Belardo to Justin Dangler (March 25, 1991). Later correspondence informed his parents that Justin could confer with the advisor to identify areas of deficiency in order to work toward improvement so that he could successfully pass the next application screening.

Justin's parents did not sit still for this rejection.[1] His father first wrote to the

1. We should note that Justin's parents actively pursue a remedy to any perceived affront to their children. For example, in 1989, their

daughter Ellen was given a lower grade in a class than she felt she deserved, resulting in her not achieving high honor status. Mr. Dangler

high school principal, defendant Michael Frischman, requesting review of the council's rejection. Frischman denied his request for intervention, finding "that the Selection Committee adhered closely to all guidelines for selection found in the National Honor Society Handbook ... [and] that the members of the Selection Committee exercised their discretion in a legitimate manner, and with the good faith expected of them." Letter from Michael Frischman to Richard Dangler (April 10, 1991). Mr. Dangler next wrote to the superintendent of schools, John V. Doherty, requesting review of the council's decision. Doherty declined to review the decision on the basis that the high school principal has the final say in matters relating to application to the NHS. He also sent to Mr. Dangler copies of the rating sheets prepared by faculty members and copies of disciplinary referrals in Justin's file. Mr. Dangler was invited to review Justin's cumulative folder and health records kept on file at the high school. Carol Ross, the Assistant Superintendent for Secondary Schools, reviewed the procedure used by the principal in conducting the appeal in the high school and informed Mr. Dangler that the review was comprehensive and appropriate to the matter. Letter from Carol Ross to Richard Dangler (May 1, 1991).

After reviewing his son's files, Mr. Dangler wrote back to Doherty requesting that ten disciplinary records be removed from his son's school files because they were erroneous. These records included six cutting class referrals, one referral for calling two school secretaries "assholes", and referrals for leaving class inappropriately. The high school principal wrote to Mr. Dangler indicating that the six cutting referrals were removed from Justin's file, leaving four disciplinary referrals still in his record.

Mr. Dangler was still dissatisfied. He wrote to Doherty again, asking that Justin's admission to the NHS be facilitated because the existence of the six cutting

referrals was a substantial part of the record on which Justin's application was considered. No response was apparently made.

Lisa Dangler, Justin's mother, then filed this suit on behalf of her son seeking, among other things, to enjoin the defendants from excluding him from the NHS. The complaint alleges that Justin was deprived of property without due process of law in retaliation for his and his father's exercise of their first amendment rights.

Before us now is plaintiff's motion for a preliminary injunction to compel the school authorities to admit Justin into the NHS.

## DISCUSSION

■ A preliminary injunction is an extraordinary remedy not to be routinely granted. *Patton v. Dole*, 806 F.2d 24, 28 (2d Cir.1986). The general standard for granting such relief in this circuit is well settled: to justify the issuance of an injunction, the plaintiff must show "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979).

### *Likelihood of Success on the Merits*

To state a claim under 42 U.S.C. § 1983, it is necessary that there be a deprivation of a right, privilege or immunity secured by the Constitution or federal laws. Plaintiff contends that Justin was deprived of property without due process of law and that he was denied admission to the honor society in retaliation for his and his father's exercise of their first amendment rights.

■ Plaintiff's first claim has little likelihood of success on the merits. Expecta-

---

then went to Ellen's teachers and her grade in Latin was changed from an A to an A+. This grade was then changed back by Michael Frischman, the high school principal, because

he believed that grades should not be raised as favors to students. The Danglers contend that the revision was the result of the animus felt by Mr. Frischman toward the Dangler family.

tions in benefits are accorded the same protection under federal law as traditional property. *See, e.g., Perry v. Sindermann,* 408 U.S. 593, 601–602, 92 S.Ct. 2694, 2699–2700, 33 L.Ed.2d 570 (1972) (teacher whose contract had been renewed for ten consecutive years may have property interest in tenure); *Goldberg v. Kelly,* 397 U.S. 254, 262, 90 S.Ct. 1011, 1017, 25 L.Ed.2d 287 (1970) (welfare recipients entitled to pretermination hearing); *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (procedural protections of the Due Process Clause triggered by official cancellation of a prisoner's good-time credits). Indeed, it is axiomatic that "property" denotes a broad range of interests that are secured by existing rules or understandings. *Perry v. Sindermann,* 408 U.S. at 601, 92 S.Ct. at 2699.

■ However, to have a property interest in a benefit, which clearly membership in the National Honor Society is, a person must have a legitimate claim of entitlement to it. *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Entitlement does not derive from an abstract need or desire for the benefit nor does it emerge from a unilateral expectation that it will be given. Instead, property interests are "created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law— rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.*

Justin Dangler contends that his due process rights were violated when unfounded cut slips and disciplinary referrals were placed in his student personnel file which may have influenced the faculty council to reject him for membership. Before one is entitled to due process, however, the property right must be established. Though plaintiff does not address this issue, assuming instead that membership in the honor society is his fundamental right based on his own analysis of his record, the requisite analysis cannot be circumvented. Thus,

Justin has a property interest in membership in the NHS only if it can be shown that there were rules or understandings which support his claim.

The Constitution of the Yorktown High School National Honor Society establishes that selection for membership in the NHS is by a faculty council and is based on outstanding scholarship, character, leadership, and service. Article VII, § 1. While the measurement of scholarship is quantified in the eligibility criteria, the measure of leadership, character and service is qualitative, left to the discretion of the faculty committee. There are no absolute standards to which a student can compare his or her record and conclude, unlike an applicant for welfare benefits, that he or she is entitled to the benefit. Nothing in the rules of the National Honor Society or the Yorktown chapter of the Honor Society can be construed as creating an understanding that Justin Dangler, on his record, would be admitted to the NHS.

Under the *Roth* standard, membership in the National Honor Society is simply not an entitlement. Justin is not the first student to litigate this issue and unanimously, courts have concluded that membership in the National Honor Society does not give rise to a property interest which entitles one to due process of law. *See, e.g., Price v. Young,* 580 F.Supp. 1 (E.D.Ark.1983); *Karnstein v. Pewaukee School Bd.,* 557 F.Supp. 565 (E.D.Wisc.1983); *Dallam v. Cumberland Valley School District,* 391 F.Supp. 358 (M.D.Pa.1975).

Plaintiff also contends that Justin has a property interest in the fairness of the selection process itself. One cannot have a protected interest in a fair process. Since "[i]t is a defense to a claim of deprivation of property that the process was fair," *Narumanchi v. Board of Trustees of Connecticut State Univ.,* 850 F.2d 70, 73 (2d Cir.1988), the integrity of the process cannot be property. A cause of action can be derived from the unfair application of the process to Justin.[2] However, unless feder-

---

**2.** Plaintiff also contends that the inclusion of erroneous cutting referrals in Justin's file con-

stitutes a due process violation. Cutting referrals are matters of school discipline, also left to

al rights are implicated in the unfair application, this court may not properly review the application process. Moreover, "[i]t is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion." *Wood v. Strickland*, 420 U.S. 308, 326, 95 S.Ct. 992, 1003, 43 L.Ed.2d 214 (1975). It is true that this evaluative process is subjective. That it is subjective does not render it unfair.

> Most honors are alike in that some individual or committee must review what someone has accomplished and make a subjective judgment of whether that conduct is deserving of reward or recognition. Inherent in such a system is the possibility of error. If Paul Newman (The Verdict) "wins" the academy award instead of Dustin Hoffman (Tootsie), who is to say that he is really more deserving?

*Karnstein v. Pewaukee School Board*, 557 F.Supp. at 567.

Plaintiff also argues that the first amendment was violated because Justin's rejection from the honor society was in retaliation for his and his father's exercise of their rights of free speech. He asserts that different standards were applied to his application than were applied to other students.

■ When rules and standards are established for selection, all applicants have the right to be considered without reference to unconstitutional factors. *Mt. Healthy Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). If standards have been administered in an arbitrary and capricious manner but not on the basis of any constitutionally prohibited factors, the improper decision does not give rise to a violation of § 1983. On the other hand, use of unconstitutional factors in rendering an arbitrary and capricious decision does give rise to a cause of action under this section.

Defendants contend that in Yorktown High School, all students applying to the Honor Society are subjected to the same

the discretion of school officials if no constitutional rights are implicated. Thus, we will not

evaluative process and the discretionary wisdom of the faculty committee. They argue that Justin's application was not treated any differently from that of any other student and that he was rejected because the faculty committee felt he lacked the requisite character and maturity. *See* Affidavit of Louis Campagna (July 2, 1991); Affidavit of Albert Reid (July 2, 1991); Affidavit of Edward Creiner (July 2, 1991). Plaintiff maintains that the reasons offered for Justin's rejection were pretextual and that the motivating factor was the exercise of free speech by Justin and his father.

■ Public high school students have substantive and procedural rights while at school. *Tinker v. Des Moines School Dist.*, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969). However, "§ 1983 was not intended to be a vehicle for federal-court corrections of errors in the exercise of that discretion which do not rise to the level of violations of specific constitutional guarantees." *Wood v. Strickland*, 420 U.S. at 326, 95 S.Ct. at 1003. Our duty is therefore to determine whether plaintiff has an actionable First Amendment claim.

■ In March 1991, Justin wrote an article for the school newspaper which plaintiff has characterized as "controversial". This article, an eloquent plea for racial tolerance, reported the results of a poll taken at Yorktown High School on racial attitudes. Plaintiff contends that this article was assigned by Justin's social studies teacher and contends that this article was published over the opposition of Frischman who felt that the article's publication would be "counter-productive" and would give a "false impression" about the school. Affidavit of Richard Dangler, ¶ 6. Frischman denies ever opposing the article and indeed states that he reviewed the survey with Justin and ultimately approved the article for publication. Affidavit of Michael Frischman (July 3, 1991). This factual dispute is resolved by the words of Justin himself. In his article he wrote:

address the erroneous cutting referrals in this context.

[I]t is important that I point out that the assignment to engage in this project was given to me by the Voice with the approval of the administration. This is important because, not only was the subject matter problematical and the contemplated results tenuous, but more importantly, the fact that I received this support recognizes that the subject was possibly one of concern to be dealt with, not avoided.

Dangler, J., "Poll on Prejudice Reveals Concern & Hope", *The Voice* (March 1991).

Simply put, Justin's article states that he had the approval of the administration. Frischman is part of the administration. Justin's own facts destroy his claim. The argument that Justin's rejection from the NHS, which took place shortly after the publication of this article, was in retaliation for the article is undercut by the non-controversial nature of the article and the fact that the administration approved its publication. Moreover, plaintiff's suggestion that the erroneous disciplinary references were maintained in retaliation for the article is impossible in light of the fact that all the disciplinary referrals were made in 1988, 1989 or 1990, prior to the article's writing. Finally, plaintiff's contention that the principal's review of the faculty committee's decision or the superintendent's decision not to review were motivated by malice does not implicate first amendment concerns and we need not address that issue.

Plaintiff also contends that the decision to reject Justin from the NHS was in retaliation for his father's speaking publicly about many issues concerning public education including the awarding of school bus contracts. Mr. Dangler has been an outspoken critic of the school board and administration for years and has openly clashed with the school system's leadership. Additionally, his active involvement in matters concerning his children such as their grades, their classes, their bus transportation and their school assignments made Mr. Dangler well-known to the high school administration.[3]

The first question to be addressed is whether Justin can assert what is essentially his father's first amendment privilege. As a rule, a litigant may not assert the rights of others to obtain relief from injury themselves. *Singleton v. Wulff,* 428 U.S. 106, 113–14, 96 S.Ct. 2868, 2874, 49 L.Ed.2d 826 (1976). An exception to the rule will be made if 1) the third party's enjoyment of the right in question is "inextricably bound up with the activity the litigant wishes to pursue," *id.,* and 2) the third party is unable to assert his or her own right, *id.; see National Union of Hosp. and Health Care Emp. RWSDU, AFL–CIO v. Carey,* 557 F.2d 278, 281 (2d Cir.1977).

Application of these principles to this case indicates that it is proper for Justin to assert his father's rights. If a parent is threatened that decisions adverse to his or her child's interests will be made in retaliation for the parent's speaking out on matters of public concern such as the bidding system in Yorktown for school bus contracts, a chilling effect on protected speech can reasonably be anticipated. There is little question that the activity Justin wishes to pursue and his father's right to voice his opinion on public matters are "inextricably bound up" if retaliation can animate the faculty council's decision to reject him from the NHS.

The second prong to be satisfied—whether Mr. Dangler can, on his own, vindicate his own freedom of speech—poses a more difficult question. On the surface, it would seem that any person can defend his or her own first amendment rights. But, in this case, for Mr. Dangler to successfully do so, he would have to assert the damages accruing to him as a result of Justin's rejection from the honor society. *See Sondel v. McDermott,* 775 F.2d 859, 863 (7th Cir. 1985) (person alleging that his stepdaughter was fired in retaliation for his political speech would have to claim, as part of his damages, the cost to him of his stepdaugh-

---

**3.** Whether voicing dissatisfaction over matters directly concerning one's children implicates the first amendment is not clear. However, since Mr. Dangler has been vocal about other matters, clearly within the realm of public debate, we need not reach this issue.

ter's losing her job). This is not a loss that can be given any monetary value. Under such circumstances, it seems appropriate to allow the child here, who can assert meaningful damages, to sue in order to discourage the subtle type of retaliation for exercising first amendment rights which may have been in operation in this case. *See Molerio v. FBI*, 749 F.2d 815, 824–25 (D.C.Cir.1984) (allegations that a third party's political activities caused plaintiff to be fired in retaliation may provide a cause of action). On these somewhat unique facts, we find that Justin has standing to assert his father's first amendment privilege.

 With that aside, the merits of Justin's claim must be considered. We find that there is a factual question underlying the likelihood of success of the merits of Justin's first amendment claim which cannot be resolved on the current record. Plaintiff alleges that the decision by the faculty council to reject Justin from the honor society was motivated by the desire of the school administration to retaliate against Mr. Dangler for his outspoken personality. Defendants have denied this, arguing that Justin's application was reviewed and considered, as required by NHS and Yorktown High School procedures, and rejected because it was believed that Justin lacked the requisite character to be a member of the honor society. Candidates are evaluated on the basis of service, leadership, and character. To aid the faculty council in making its decisions as to the character, leadership and service of each applicant, the views of the applicant's teachers are solicited.[4] Accordingly, 22 of Justin's teachers were asked for recommendations. Eleven teachers responded: six recommended his admission to the NHS, three recommended against and two abstained. The council's policy apparently was to reject students who had received two or more "no" recommendations where the "no" votes have been held valid after those teachers defended their position before the faculty council. Two of the teachers providing a "no" recommendation to Justin's application, Mr. Kowalski and Mr.

Snyder, visited the committee to defend their votes. Evidence submitted to this court indicates that the rejection of Justin by the faculty council was unanimous.

The members of the faculty council assert, by affidavit, that the rejection decision was not influenced by outside factors. Nevertheless, it may be that the tension between Mr. Dangler and Mr. Frischman was common knowledge in the school. In addition, the fact remains that these teachers reported to Mr. Frischman. Though the record, as constructed, strongly suggests that no improper motives underlay the decision to deny Justin membership in the NHS, the plaintiff asserts otherwise and this is sufficient to raise the specter of a factual question upon which the likelihood of success on the merits by plaintiff rests.

In this circuit, questions of motive are not properly resolved on motion because credibility necessarily becomes an issue. In *Wakefield v. Northern Telecom, Inc.*, 813 F.2d 535 (2d Cir.1987), the plaintiff alleged that the defendant discharged him in order to deny him commissions he was allegedly owed; the defendants argued that the plaintiff's discharge was the result of a reduction in the size of its work force. There, prior to trial, the only evidence that the plaintiff had to support his position was his "own subjective belief." *Id.* at 540. Nevertheless, the court held that a hearing was necessary because state of mind was in issue.

Under these circumstances, an evidentiary hearing to determine the likelihood of success on the merits of the plaintiff's first amendment claim is warranted. Ordinarily, plaintiff must make a showing of irreparable harm before a preliminary injunction hearing would be held. Plaintiff has requested, pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure that the injunction hearing and the trial on the merits be combined into one proceeding after expedited discovery in order to speedily resolve what he views as a vexing issue.

**4.** This policy is consistent with the rules and regulations of the National Honor Society.

We will grant the plaintiff's request.[5] If the trial of the merits is accelerated and consolidated with the preliminary injunction hearing, then no determination of irreparable harm need be made by this court. *See Cronin v. United States Dept. of Agriculture,* 919 F.2d 439, 445 (7th Cir.1990); *Drummond v. Fulton County Dept. of Family and Children's Services,* 563 F.2d 1200, 1204 (5th Cir.1977).

The parties will be permitted discovery and a consolidated injunction hearing and trial will be held on August 29, 1991 at 10 o'clock or as soon as the trial immediately preceding has completed.

SO ORDERED.

---

5. Defendants object to the consolidation on the basis that key witnesses are school personnel who traditionally take extended vacations during the summer months and are therefore not available for a trial. However, this trial will not take place until the very end of summer when school personnel would be preparing for the beginning of the next school year.