632 A.2d 463

Florence H. BLEICH

v.

**FLORENCE CRITTENTON SERVICES
OF BALTIMORE, INC., et al.**

No. 169, Sept. Term, 1993.

Court of Special Appeals of Maryland.

Nov. 2, 1993.

124

Robert B. Levin (Shiling, Bloch & Levin, P.A., on the brief), Baltimore, for appellant.

Elizabeth G. Jacobs (Marcy M. Hallock, on the brief), Baltimore, for appellees.

Argued before WILNER, C.J., and FISCHER and MOTZ, JJ.

MOTZ, Judge.

This appeal involves a claim of wrongful discharge and intentional interference with business relationships.

(i)

From 1983 to 1992, appellant, Florence H. Bleich, was employed by appellee, Florence Crittenton Services of Baltimore, Inc. (FCS), a non-profit agency that provides residential and educational programs and services for adolescent females in personal crisis. FCS is licensed as a residential child care facility through the Maryland Department of Human Resources Social Service Administration's Group Licensing Unit. *See* Md.Fam.Law Art. §§ 5–501 to 5–588 (1984, 1991 Repl. Vol., 1992 Cum.Supp.). Appellee, Anne S. Davis, has been executive director of FCS since 1977.

Ms. Bleich began working for FCS in December, 1983 as a teacher in the area of child development and life skills. In February 1990 she was made a full-time teacher; however, effective January 3, 1992, assertedly because of programmatic

and economic changes, her hours were reduced to twenty hours a week. Her last performance review, prior to the events leading to this lawsuit, was completed in June, 1991. In it she was rated eight or better, out of a possible ten, in all—twelve—categories. The evaluation stated that she was "a key member of the teaching staff. . . . willing to take on responsibility not assigned as part of her job description [and]. . . . willing to help out in areas that are not always covered by her job title." The evaluation was completed by Ms. Bleich's immediate supervisor, David Barnstable, and reviewed by Ms. Davis.

In her affidavit, Ms. Bleich stated that beginning in 1991 "the atmosphere at FCS began to change dramatically." "Gang type groups" began forming among various residents. "[T]here were several incidents in which residents and staff were intimidated, assaulted and battered by other residents." One such incident occurred in November of 1991 when a "riot situation" occurred, "residents and staff were assaulted by other residents," "police were called to FCS to intervene, and a total of 17 of the 23 residents were removed from FCS." Ms. Bleich further stated that "[b]ecause of [her] concerns for the health, safety and well-being of the residents of FCS and its staff, on numerous occasions [she] expressed concern about this unsafe environment to both [appellee] Davis and [Ms. Bleich's] direct supervisor, Barnstable." On January 7, 1992, during a clinical staff meeting attended by Ms. Davis and other FCS staff, Ms. Bleich again "voiced concerns regarding what [she] believed to be the dangerous and unsafe situation for the residents and staff at FCS;" she stated that she "believed that a major cause of these problems was the lack of effectiveness of the administration at FCS." After that meeting and for the next several months, her concerns for the health and safety of residents and staff "continued to intensify" and she continued to voice these concerns to Ms. Davis and Mr. Barnstable.

When it did not appear to Ms. Bleich that Ms. Davis was "taking any actions to address these dangerous situations," on Friday, March 13, she wrote and mailed a letter to the State

licensing specialist assigned to FCS. That letter stated, in pertinent part:

There needs to be an immediate investigation of Florence Crittenton Services (FCS). The safety of both the residents and the staff is questionable to say the least.

Within the resident population there's what appears to be a gang-type movement afoot. In some respects it seems that the residents run the agency by intimidation, threats, blatant disrespect, and attacks on their peers as well as members of the staff.

. . . .

How can the specific needs of the residents be properly addressed if the children aren't safe from one another, in what's supposed to be an environment of safety and care? It appears to me, that there's scant internal administrative control. In some regards these children might be safer in the environments from which they've been removed.

Ms. Bleich signed the letter, identifying herself as an employee of FCS, and provided her home address; she also sent copies of the letter to L. Carl Holmes, the President of the FCS Board of Directors, Ms. Davis, other FCS staff, and Sergeant Bull of the Baltimore City Police Department.

On Monday, March 16, 1992, Ms. Bleich received a letter, dated March 13, hand-delivered by a messenger service, from Ms. Davis. That letter advised Ms. Bleich that her employment with FCS was "terminated effective March 13, 1992 at the close of the business day." The letter explained that "[t]his action is due to a consistent lack of respect for agency policies, procedures, and management decisions as expressed in your memo dated 3/7/92." Ms. Bleich sent copies of her March 7, 1992 memo to Ms. Davis, Mr. Holmes, Mr. Barnstable, and other FCS staff advising them that Ms. Bleich would not be taking a FCS resident out job hunting and stating:

It's obvious, that administratively, nothing has been planned for residents who need to seek employment. It's a disgrace that appropriate financial provisions have not been made for

such situations! How on earth can the administration, of Florence Crittenton Services, claim to be steering youth towards independence if something as basic and necessary as this has not been planned for?

This memorandum apparently responded to Ms. Davis's memorandum of March 6, 1992 informing Ms. Bleich that:

As per your conference with Mr. Barnstable today, we will pay you an hourly wage at your normal rate when you are involved in taking [a resident] on interviews. I have been in touch with the Department of Juvenile Services to ascertain if they will contract for this service. I feel we will be able to get some funds to carry this out.

However, we must at this time limit it to two weeks, as we evaluate it to see how many hours are involved. We must write a proposal to get it funded, therefore we must first document the time.

We will be taking this on a case by case basis until the Independent Living Program is funded.

Mr. Holmes, Ms. Davis, and Mr. Barnstable stated in their similarly worded affidavits that they consulted on March 13, 1992 and "decided to terminate Ms. Bleich's employment with FCS effective that day, March 13, 1992," because of her "consistent lack of respect for agency policies, procedures and management decisions, particularly as reflected" in the "insubordinate [March 7] memo." They further asserted that Ms. Bleich "had previously written a letter" to a State education official "without any authorization or knowledge of FCS, inquiring about the status of a special education program at FCS" and that letter was "also a factor in the decision to discharge Bleich." They all swore that the decision to discharge Ms. Bleich was made "prior to ... receipt" of Ms. Bleich's letter complaining to the State licensing authorities about FCS and that Ms. Bleich's letter to the licensing authorities "was not a factor in the decision to discharge" her.

Mr. Holmes, Ms. Davis, and Mr. Barnstable explained in their affidavits that the termination letter was prepared by Ms. Davis on Friday, March 13, 1992, and was not mailed that

day only because "all such letters are reviewed by counsel for FCS and counsel was out of town and unavailable." When Ms. Davis still could not reach counsel on Monday morning, March 16, she contacted another attorney, who reviewed it; Ms. Davis then "gave the letter ... to a messenger for delivery to Ms. Bleich." It was not until after Ms. Davis sent that letter that, she asserts, she learned from Mr. Holmes that he had received in the mail a copy of Ms. Bleich's letter to State licensing authorities. One of FCS's lawyers filed an affidavit stating that he was unavailable on March 13, 1992, and "Ms. Davis left a message on my voice mail advising that FCS had decided to terminate an employee, and requesting that I call her as soon as possible to discuss the termination." The lawyer did not "return from vacation until March 23, 1992, at which time [he] heard Ms. Davis' message on [his] voice mail."

On July 21, 1992, Ms. Bleich filed a two-count complaint against FCS and Ms. Davis. Count One asserted that FCS and Ms. Davis wrongfully discharged Ms. Bleich; Count Two asserted that Ms. Davis intentionally interfered with Ms. Bleich's business relationships with FCS. On August 24, 1992, FCS and Ms. Davis filed an extensive "motion to dismiss, or in the alternative, motion for summary judgment;" the motion was supported by a nineteen page memorandum, four affidavits, and two additional exhibits. On October 5, 1992, Ms. Bleich filed a twenty-eight page memorandum in response to that motion, which was supported by Ms. Bleich's affidavit, and eight exhibits. FCS and Ms. Davis promptly countered with another long (18 pages) memorandum.

On October 13, 1992, the Circuit Court for Baltimore City issued an order granting the motion. There is no transcript of the oral argument before the circuit court; the order provided in its entirety:

Upon consideration of Defendant's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, and Plaintiff's Opposition thereto, it is this *13th* day of October, 1992, by the undersigned, one of the Judges of the Circuit Court for Baltimore City, hereby

ORDERED, the Defendants' Motion to Dismiss Counts I and II of the Complaint is hereby GRANTED; and

IT IS FURTHER ORDERED, that Plaintiff shall have 30 days leave to amend the Complaint.

When Ms. Bleich failed to amend her complaint, the defendants moved to dismiss it with prejudice, which the court did in an order dated December 21, 1992.

On appeal, Ms. Bleich raises four questions:

1. Whether the public policy of Maryland prohibits an employer from discharging an employee because she has acted to protect the health and safety of children in residential settings.

2. Whether plaintiff properly alleged a wrongful discharge claim under the State's important public policy of protecting free speech on matters of public importance.

3. Whether defendants were entitled to summary judgment where there were contested issues of fact and credibility determinations which must be determined by a jury.

4. Whether appellant properly stated claims against Davis individually for wrongful discharge and for intentional interference with contractual relations.[1]

### (ii)

■ Although no party raises the question, it seems to us that it is, at the very least, unclear precisely what is before us for review and what standard of review is appropriate. As noted above, FCS and Ms. Davis moved to dismiss the complaint, or in the "alternative ... for summary judgment." Moreover, they submitted extensive memoranda, four affidavits, and two exhibits, in support of that motion. Ms. Bleich expressly responded to the "alternative" motion, and she supported her response with an even more extensive memo-

---

1. We shall address all questions raised by Ms. Bleich; they will not, however, be addressed in precisely the order in which she states them.

randum, her lengthy affidavit, and eight exhibits. Md.Rule 2–322(c) provides that

> *[i]f,* on a motion to dismiss for failure of the pleading to state a claim upon which relief can be granted, *matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment. . . .*

(emphasis added). In view of both sides' numerous submissions of "matters outside" the complaint and the circuit court's failure to exclude these "matters" from consideration, ordinarily we would follow the mandate of Md.Rule 2–322 and "treat" the court's order as the grant of summary judgment. *See Hrehorovich v. Harbor Hosp. Ctr.,* 93 Md.App. 772, 781, 614 A.2d 1021 (1992); *Haselrig v. Public Storage,* 86 Md.App. 116, 118 n. 1, 585 A.2d 294 (1991); *Castiglione v. Johns Hopkins Hosp.,* 69 Md.App. 325, 332, 517 A.2d 786 (1986), *cert. denied,* 309 Md. 325, 523 A.2d 1013 (1987). This is so even though the lower court's order stated that the motion to dismiss "is hereby granted." *See Haselrig,* 86 Md.App. at 118 n. 1, 585 A.2d 294.

The particular difficulty here is that there is nothing in the record of this case that in any way indicates that the circuit court did consider "matters outside the pleading" when ruling on the defendant's motion. In contrast, in *Castiglione* the circuit court expressly based its grant of the motion on an "unverified exhibit," 69 Md.App. at 332, 517 A.2d 786, and in *Haselrig,* the trial court, in granting the motion, "relied upon provisions of the employee handbook" not pleaded by the plaintiff. 86 Md.App. at 118 n. 1, 585 A.2d 294. In *Hrehorovich,* there was an "absence of an express indication of how the trial judge treated the case." 93 Md.App. at 783, 614 A.2d 1021. We concluded, however, that since the circuit court's order in *Hrehorovich* expressly stated that it had "considered" the "submissions of counsel" and did not indicate that "appellee's references to facts not plead [sic] by appellant were improper or excludable," the order would be treated as one granting summary judgment. *Id.* Here, not only is there no "express indication" that the circuit court considered "matters

outside the pleadings," and no statement that the circuit court considered "the submissions of counsel," but also there is an implicit indication that the court only granted a motion to dismiss. That is, the court's original grant of the motion was with leave to amend within thirty days. If the court had treated the motion to dismiss as one for summary judgment and had considered all materials "outside the pleadings" submitted by the parties, then such an order would seem to be unnecessary and improper. In other words, if summary judgment was warranted in the first instance, then it would seem that no amendment would, or could, change that result.

Determination of whether the circuit court granted a motion for summary judgment or a motion to dismiss is important because, as Judge Harrell explained in *Hrehorovich*, when:

> reviewing the grant of either a motion to dismiss or a motion for summary judgment, an appellate court must determine whether the trial court was legally correct[,] . . . this determination depends on the nature of the relief given. The grant of a motion to dismiss is proper if the complaint does not disclose, on its face, a legally sufficient cause of action. *Bramble v. Thompson*, 264 Md. 518, 520, 287 A.2d 265 (1972). On the other hand, the grant of a motion for summary judgment is proper only if there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. *Brady v. Ralph Parsons Co.*, 308 Md. 486, 495, 520 A.2d 717 (1987).

93 Md.App. at 785, 614 A.2d 1021.

In the interests of judicial economy and because all parties have fully briefed and argued this case as if the circuit court granted alternative relief, *i.e.*, dismissing the complaint or, in the alternative, granting summary judgment, we can and will, in this case, consider the propriety of both. We caution the litigants and trial courts, however, as we did in *Hrehorovich*, that "failure to articulate clearly the nature of [a] ruling in these circumstances is risky business." *Id.* at 784, 614 A.2d 1021. In another case with a similar record, a party might well assert that the only order before us was that granting a

motion to dismiss and we might have no choice but to consider only the appropriateness of that order. *See Antigua Condominium Ass'n v. Melba Investors Atlantic, Inc.*, 307 Md. 700, 719, 517 A.2d 75 (1986). Such a result would not benefit anyone or serve the interests of judicial economy.

(iii)

■ The first inquiry on the merits is whether Count One, which alleges that FCS and Ms. Davis wrongfully discharged Ms. Bleich, states a cause of action under Maryland law. In the proper circumstances, an at-will employee can assert a cause of action for wrongful discharge in Maryland. *See Adler v. American Standard Corp.*, 291 Md. 31, 47, 432 A.2d 464 (1981). Although case law is still "quite sparse," it is clear that this cause of action for wrongful discharge "will lie only where the employer's motivation in discharging the employee contravenes some clear mandate of public policy." *Miller v. Fairchild Industries*, 97 Md.App. 324, 335, 629 A.2d 1293 (1993); *see also Adler*, 291 Md. at 47, 432 A.2d 464. Moreover, "[l]egislative enactments, prior judicial decisions, [and] administrative regulations" are "the chief sources of public policy." *Lee v. Denro*, 91 Md.App. 822, 830, 605 A.2d 1017 (1992) (quoting *Adler*, 291 Md. at 45, 432 A.2d 464).

■ The first public policy mandate that Ms. Bleich asserts was violated by her discharge is not found in a prior judicial decision, legislative enactment, or administrative regulation. Rather, it is the policy expressed in the free speech guarantees of the First Amendment of the United States Constitution and Article 40 of the Maryland Declaration of Rights. Ms. Bleich acknowledges, as she must, that FCS is a private, rather than a public, employer. She does not assert that FCS is, nevertheless, a state actor or even that FCS is "liable for directly violating" her free speech rights. Instead, she maintains that the public policy in the State and federal constitutions "that an individual should not be penalized for exercising speech on matters of great importance" is violated when an employee is terminated "for speaking on such matters."

We recently rejected an indistinguishable claim of wrongful discharge against another private employer. *Miller v. Fairchild Indus.*, 97 Md.App. at 336–37, 629 A.2d 1293. As Judge Bloom explained for the Court:

> There can be no question that a retaliatory plant closing of the nature and for the reason alleged here would have an alarming potential to chill free speech. We cannot, however, say that such closings constitute violations of public policy that would give rise to an abusive discharge claim. The task of defining public policy is best left to elected representatives of the people, and it is well settled that courts should undertake the task only with "the utmost circumspection." *Adler*, 291 Md. at 46 [432 A.2d 464], quoting *Patton v. United States*, 281 U.S. 276, 50 S.Ct. 253, 74 L.Ed. 854 (1930). Constitutional prohibitions do not currently extend to private actors. This Court will not do what the framers of the state and federal constitutions themselves declined to do. We will not expand the reach of constitutional restraints.

*Id.* Constitutional free speech guarantees provide no sounder basis for a claim of wrongful discharge here than they did in *Miller*. Ms. Bleich's claim that her discharge by a private employer was wrongful because it was in retaliation for her exercise of her free speech rights fails to state a cause of action.

■ Ms. Bleich, however, asserts that a second public policy mandate was also violated by her termination. That is the policy found in Md.Fam.Law Art. §§ 5–502(b), 5–702(1), 5–704(a)[2] and the regulations implementing those statutes, COMAR 07.02.23.06D(1)(a) and 07.02.23.06D(1)(c). These statutes and regulations all deal with the protection of children from abuse and neglect and the requirement that suspected abuse or neglect be reported to State authorities. Section 5–502(b) provides, in pertinent part, that "[i]t is the policy of this State ... to protect minor children whose care has been

---

**2.** All statutory references herein are to Md.Code (1984, 1991 Repl.Vol.), Family Law Article, unless specifically noted to the contrary.

relinquished to others by the children's parent." Section 5–702(1) states that in order "to protect children who have been the subject of abuse or neglect" the purpose of subtitle 7 of the Family Law Article is to "mandat[e] the reporting of any suspected abuse or neglect." Consistent with this purpose, § 5–704(a) provides:

(a) *In general.*—Notwithstanding any other provision of law, including any law on privileged communications, each health practitioner, police officer, or educator or human service worker, acting in a professional capacity, who has reason to believe that a child has been subjected to:

(1)(i) abuse, shall notify the local department or the appropriate law enforcement agency; or

(ii) neglect, shall notify the local department; and

(2) if acting as a staff member of a hospital, public health agency, child care institution, juvenile detention center, school, or similar institution, immediately notify and give all information required by this section to the head of the institution or the designee of the head.

The regulations promulgated pursuant to these statutes provide that "[t]he paramount purpose of these regulations is the protection of children from the special risks arising from the children having to live outside their own homes." CO-MAR 07.02.23.01.A. The regulations then emphasize that "[w]hen there is a conflict ... the conflict shall be resolved in favor of the child." *Id.* Finally, to protect these children further, the regulations provide that "[t]he facility may not prevent the staff member from making [a report of neglect] and shall protect that staff member from any dismissal or other reprisal for making the report." COMAR 07.02.23.-06D(1)(c).

In her complaint, Ms. Bleich cited, quoted, and heavily relied on the above statutes and regulations. She asserted that her March 13 letter to State licensing authorities and her supervisors at FCS "was required by the Maryland [statutory] law and regulation[s], and was in furtherance of this express public policy." She further asserted that the "actions" of FCS

and Ms. Davis in terminating her "for reporting her concerns to the [State] Licensing Specialist is an action contrary to the public policy of the State of Maryland" and was "intended to punish [her] for fulfilling her statutorily prescribed duty . . . to report suspected incidences of neglect or abuse. . . ."

FCS and Ms. Davis do not maintain that "educators" and "human service workers" like Ms. Bleich have no statutory duty to report "suspected abuse or neglect." What FCS and Ms. Davis claim is that Ms. Bleich, in writing her March 13 letter, "was not invoking or fulfilling the statutory duties and responsibilities of an educator reporting suspected 'child abuse and neglect.'" This is so, they assert, because, first, Ms. Bleich did not make any oral report of child abuse or neglect, as required by § 5–704(b), second, her March 13 letter did not assert that "any child was harmed or was at risk of significant harm by any particular act of abuse or neglect," and third, that letter did not set forth the information required by § 5–704(c).

Section 5–701(b) defines "abuse" as "physical injury . . . under circumstances that indicate that [a] child's . . . welfare is significantly harmed or at risk of being significantly harmed." "'Neglect' means the leaving of a child unattended or other failure to give proper care and attention." § 5–701(n). Section 5–704(b) provides that an educator or human service worker who notifies "appropriate authorities" of child abuse or neglect "shall make an oral report . . . as soon as possible," and shall make a written report "not later than 48 hours" after the incident causing the employee to believe there was abuse or neglect. Moreover, § 5–704(c) provides that:

Insofar as is reasonably possible, an individual who makes a report under this section shall include in the report the following information:

(1) the name, age, and home address of the child;

(2) the name and home address of the child's parent or other person who is responsible for the child's care;

(3) the whereabouts of the child;

(4) the nature and extent of the abuse or neglect of the child, including any evidence or information available to the reporter concerning possible previous instances of abuse or neglect; and

(5) any other information that would help to determine:

(i) the cause of the suspected abuse or neglect; and

(ii) the identity of any individual responsible for the abuse or neglect.

■■■■ Ms. Bleich does not allege that she made an oral report of child abuse or neglect, that her March 13 letter sets forth the names of any children, or that it specifically states that any child's welfare has been, or is at risk of being, "significantly harmed." She does allege, and her March 13 letter did state, the children's "whereabouts," *i.e.,* resident at FCS, the name and address of the entity responsible for their care, *i.e.,* FCS, and the nature of the abuse or neglect, *i.e.,* "intimidation," "threats," and "attacks" by a "gang-type" movement.[3] Although the statutory words "significant harm" or "risk of being significantly harmed" are not invoked, if the charges are true, surely attacks by gangs indicate at the very least a "risk" of "significant harm." In light of this, a court would be extremely shortsighted, indeed, to hold, as a matter of law, that just because Ms. Bleich did not parrot the statutory language, make an initial oral report, or provide all of the required information in her letter, she was "not invoking or fulfilling the statutory duties ... of an educator."

Ms. Bleich did not send an anonymous letter or even one without any particulars. Rather, she identified herself by

---

**3.** Furthermore, although Ms. Bleich did not send the letter to the "local [social services] department", she did send it to the State social service official with whom she was familiar and she sent copies of it to what she apparently believed to be the "appropriate law enforcement agency," *i.e.,* the Baltimore City Police Department, and the head of the institution, *i.e.,* the Chairman of the Board and Executive Director of FCS. This would seem to comply in substantial part with the requirements in § 5–704 as to whom reports of child abuse are to be reported. In any event, neither FCS nor Ms. Davis makes any assertion that Ms. Bleich's March 13 letter fails to constitute a report of child abuse because it was sent to the wrong agency or officials.

name, and as a FCS employee; she described the kind of abuse she suspected, and the victims and the abusers, albeit generically rather than by name. She alleged in her complaint that this was a report of abuse or neglect and that she was fired for sending this letter.[4] This was enough to state the basis for a cause of action for wrongful discharge. *See, e.g., Hirsovescu v. Shangri–La Corp.,* 113 Or.App. 145, 831 P.2d 73, 75 (1992) (plaintiff who asserted he was discharged because he made "good faith reports" of "potential physical abuse" to patients in a residential care center set forth a cause of action for wrongful discharge); *McQuary v. Bel Air Convalescent Home,* 69 Or.App. 107, 684 P.2d 21, 23–24 (plaintiff, who alleged she was fired because she threatened to report nursing care patient mistreatment to state agency, set forth cause of action for wrongful discharge even if in fact there was no mistreatment), *cert. denied,* 298 Or. 37, 688 P.2d 845 (1984); *Witt v. Forest Hosp., Inc.,* 115 Ill.App.3d 481, 71 Ill.Dec. 123, 450 N.E.2d. 811 (1983) (nurse who alleged she was fired for providing information to State guardianship and advocacy commission stated cause of action for wrongful discharge); *see also Prince v. Rescorp Realty,* 940 F.2d 1104, 1110 (7th Cir.1991) (employee, who alleged he was fired for reporting to State officials violations of State Fire Marshall Act, held to state cause of action under Illinois law for wrongful discharge).

*Mudd v. Hoffman Homes for Youth, Inc.,* 374 Pa.Super. 522, 543 A.2d 1092 (1988), on which FCS and Ms. Davis heavily rely, is not to the contrary. There, the court held that a social worker's assertion that she was discharged by her employer, a private social services provider, for reporting alleged "drug use and child abuse" to the Board of Directors of the provider, did not state a claim for wrongful discharge. Critical to this holding was the fact that the only enunciation

---

**4.** Of course, the defendants may ultimately be able to prove that one or both of these facts are not true, *i.e.,* that the letter was not *intended* to report child neglect or that Ms. Bleich was not fired for sending the letter. To date, defendants have attempted to prove only the second fact. See *infra* § (iv).

of public policy that the plaintiff relied on in her complaint was the Pennsylvania Child Protective Services Law, which specifically provided that the duty of "[a] member of the staff," like the plaintiff, to report suspected abuse was satisfied as soon as she reported that abuse to "the person in charge of [the] institution, school, facility or agency." *Id.* 543 A.2d at 1094 n. 2 (quoting Child Protective Services Law, 11 P.S. § 2204(b)). In view of this statute, the Pennsylvania intermediate court concluded:

> [a]ppellant was not dismissed for seeking the disclosure and punishment of the improper actions of co-workers, but with respect to public policy grounds was terminated for pursuing the matter outside normal management operating procedures. This alone cannot give rise to a non-statutory cause of action for wrongful discharge. By appellant's averments the alleged harassment and retaliatory actions did not occur until after appellant went outside normal operating procedures leading us to conclude that no public policy mandate was violated because the complained of actions were not in response to appellant's attempts of fulfilling her duty, but instead were a direct result of her method of reporting the co-workers [sic] activities and seeking what she deemed to be appropriate action regarding them.

*Id.* at 1095.

Maryland law contains no similar provision relieving Ms. Bleich from a duty to report child abuse to governmental authorities as soon as she reports the abuse to "the person in charge of [the] ... facility." Rather, Maryland law requires "*each* ... educator or human service worker ..., who has reason to believe that a child has been subjected to" abuse, to report that abuse to governmental authorities. § 5–704(a). (emphasis added). Moreover, Maryland law specifically provides that a staff member is protected from "any dismissal or other reprisal for making" such a report. COMAR 07.02.23.-06D(1)(c). *Mudd* is, therefore, inapposite.

(iv)

■ Having determined that Ms. Bleich's Count One does state a cause of action for wrongful discharge, we turn to the

question of whether a grant of summary judgment against Ms. Bleich on this count was proper. FCS and Ms. Davis assert that the "undisputed facts" set forth in the affidavits of the three FCS officers or employees, who were "involved in the decision to discharge" Ms. Bleich, "demonstrated that the decision to discharge her was made on Friday, March 13, 1992, *before* they had any knowledge" of Ms. Bleich's letter to State authorities. In their affidavits, Ms. Davis, Mr. Barnstable, and Mr. Holmes do unequivocally state, in identical language, that they "decided to terminate" Ms. Bleich for "lack of respect for ... management decisions" on March 13, 1992, "prior to receipt" of Ms. Bleich's letter to State licensing authorities. They further unequivocally state that Ms. Bleich's letter "was not a factor in the decision to discharge her." Although Ms. Bleich can and does argue to the contrary, she has not, indeed she concededly cannot, factually dispute those affidavits. This is so because the facts set forth in those affidavits involve the intent and motive of FCS employees and so are peculiarly within their knowledge.

It is now well established that just because questions as to "state of mind" are at issue, summary judgment is not necessarily improper. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256–57, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986); *Gross v. Sussex Incorporated,* 332 Md. 247, 257, 630 A.2d 1156 (1993) ("even in cases involving intent and motive if the prerequisites for summary judgment are met—there is no dispute as to material fact—summary judgment may be granted"). Here, in attempting to defeat summary judgment, Ms. Bleich does not merely rely on a claim that "the jury might, and legally could, disbelieve the defendants' denial[s]" of improper motive in discharging her. *Compare Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514. *See Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 512, 104 S.Ct. 1949, 1966, 80 L.Ed.2d 502 (1984) ("discredited testimony is not [normally] considered a sufficient basis for drawing a contrary conclusion"). Rather, she has produced "significant probative evidence tending to support" this claim. *Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514 (quoting *First Nat'l Bank of Arizona*

*v. Cities Service Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968)).

This evidence includes (1) Ms. Bleich's prior nine-year history of satisfactory job performance, including her most recent excellent evaluation, which was reviewed by Ms. Davis herself; (2) Ms. Bleich's presently uncontroverted affidavit that, in the months immediately preceding her discharge, she voiced repeated concerns to her superiors, including Ms. Davis, about the "dangerous and unsafe situation for the residents and staff at FCS" and that her superiors failed to do any thing about the situation; (3) the timing of Ms. Bleich's letter to State authorities and the letter from FCS terminating her; and (4) the somewhat unusual method of transmission of the termination letter. We note that we are *not* confronted with a case in which the termination letter was postmarked or sent prior to or even on the same day as Ms. Bleich's letter to State authorities reporting possible child abuse. Rather, it is uncontested that the latter was postmarked on March 13 and received by FCS on March 16 and that the former, the termination letter, although dated March 13, was never mailed to Ms. Bleich, and was not hand-delivered to her until March 16, the same day in which FCS concedes it received her letter. A "fair-minded jury", *Seaboard Surety v. Kline*, 91 Md.App. 236, 244, 603 A.2d 1357 (1992) (quoting *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512), could conclude on these facts, that, despite the testimony of FCS officers and employees to the contrary, FCS had discharged Ms. Bleich because of her letter to State licensing authorities.

Recently, the Second Circuit considered a somewhat similar case. There, a salesman sued his employer for breach of an employment contract, asserting that the principal motivation for his discharge was to avoid paying him a commission on a multimillion dollar sale that had been substantially completed prior to his discharge. *Wakefield v. Northern Telecom, Inc.*, 813 F.2d 535 (2d Cir.1987). The appellate court held that the court below had erred in granting the employer summary judgment on the motivation issue, even though there con-

cededly was no *"direct* evidence to support" the salesman's belief as to his employer's motivation and there was "countervailing evidence produced" by the employer that "it had merely effected a general reduction in work force ... and that [the salesman] had been insubordinate." *Id.* at 540. (emphasis in original). The *Wakefield* court noted that there was "circumstantial evidence" supporting the salesman's claim including (1) his record as a "capable salesman with a reputation for success;" (2) the employer's knowledge that he had "performed the work enabling" this very large sale to "go through;" and (3) the fact that shortly after his discharge, the sales contract was signed and his employer paid no one a commission on the sale. *Id.* The Second Circuit found that this "circumstantial evidence" was sufficient to prevent grant of summary judgment, explaining:

> Rarely, in a wrongful termination case, is the plaintiff privileged to have such direct evidence to support his claim. Prima facie cases are usually established by circumstantial evidence that may include just such a sequence as was shown here.

*Id.; see also Clements v. County of Nassau,* 835 F.2d 1000, 1005 (2d Cir.1987); *Dangler v. Yorktown Cent. Schools,* 771 F.Supp. 625, 631 (S.D.N.Y.1991). It seems to us that this rationale is equally applicable here and for these reasons grant of summary judgment on the factual record developed to date on the wrongful discharge claim was improper. This, of course, does not mean that a jury could not ultimately find in favor of FCS, but only that, on this record, it should be permitted to make that decision.

■ Ms. Davis additionally claims that even if summary judgment on the wrongful discharge count was not proper as to FCS, it was proper as to her. This is so, she asserts, because in discharging Ms. Bleich, she "was simply acting in her role as an agent of the corporation" and so is not individually liable to Ms. Bleich. In making this claim, Ms. Davis heavily relies on *Moniodis v. Cook,* 64 Md.App. 1, 494 A.2d 212, *cert. denied,* 304 Md. 631, 500 A.2d 649 (1985). There, we considered whether a trial court properly denied motions for

directed verdicts by certain individual defendants in a wrong-
ful discharge case. These individuals were the Divisional
Manager and District Supervisor of the employer, Rite–Aid of
Maryland, Inc., a large drugstore chain. *Id.* at 14, 494 A.2d
212. We noted that there was no evidence that these individu-
als played a "dominant role" in the affairs of the employer.
One had "little or no policy-making authority," and the other
had some limited authority in conjunction with other officers
senior to him who "held the ultimate veto power over the
policy." *Id.* For these reasons, we concluded that these
individuals were not "clothed with the essential attributes of
[the] employer" and so their motions for directed verdict on
the wrongful discharge count should have been granted. *Id.*
at 15, 494 A.2d 212.

In her complaint, Ms. Bleich alleged that Ms. Davis was the
Executive Director of FCS, that she was sued in "her individu-
al capacity" and that

> Davis is personally liable for Plaintiff's [Ms. Bleich's] wrong-
> ful discharge in that she used her influence and control to
> have Plaintiff wrongfully and abusively terminated because
> Plaintiff had voiced concerns regarding the neglect of and
> safety of the residents and staff at FCS due to poor
> management, of which *Davis is in charge,* and had reported
> these concerns to the Licensing Specialist for DSS.

(emphasis added). In her affidavit, Ms. Bleich elaborated that
Ms. Davis "was the Chief Executive Officer/Executive Di-
rector of FCS." In the FCS annual report for fiscal year
1991, which was attached as an exhibit to Ms. Bleich's affida-
vit, Ms. Davis is identified as "CEO/Executive Director."

The FCS Personnel Practices Manual and Employee Hand-
book (Personnel Handbook), which was another exhibit to Ms.
Bleich's affidavit, lists 55 FCS employees, with Ms. Davis
listed first and identified as Executive Director. The Person-
nel Handbook provides:

> Florence Crittenton Services of Baltimore, Inc. is a non-
> profit corporation *controlled by a volunteer Board of Di-
> rectors who establish its policies* on behalf of the client

group it serves. *Administrative responsibility is vested in an Executive Director/Chief Executive Officer* who employs staff to implement the service within the policies and budgetary limitations of the organization.

. . . .

The Executive Director/Chief Executive Officer *shall make* [employment] *appointments* in the light of the particular needs of the agency . . .

(emphasis added). The Personnel Handbook lists eleven items that the Executive Director is particularly responsible for implementing. These include:

Assisting in establishing goals and objectives.

. . . .

Insuring that the merits and talents of all staff persons are fully developed and utilized.

. . . .

Evaluating hiring and promotion patterns periodically to evaluate progress and to remove impediments to the attainment of goals.

The Personnel Handbook provides the Executive Director with authority, *inter alia,* to determine bonuses, grant extended leave, and approve family leave. Finally, in their affidavits, the Chairman of the FCS Board, Mr. Holmes, Ms. Bleich's immediate supervisor, Mr. Barnstable, and Ms. Davis herself, all stated they had "decided to terminate Ms. Bleich's employment."

On this record, the *Moniodis* holding and rationale do not support the grant of summary judgment to Ms. Davis on the wrongful discharge claim. Rather, in *Moniodis,* we specifically explained that "an 'officer' of a corporation . . . who plays a *dominant role in the affairs of the corporate employer* and who *primarily formulates the corporation's decision to fire a particular employee* " should not "be permitted to take refuge behind the corporate veil in order to insulate [her]self from

liability for [her] own wrongful conduct." 64 Md.App. at 14, 494 A.2d 212 (emphasis added). Although the evidence to date as to Ms. Davis's "dominant role" in FCS is not overwhelming, we cannot say that a fair-minded jury could not find on the basis of it that she did exercise a dominant role and "primarily formulate[d]" the FCS decision to fire Ms. Bleich.

### (v)

Ms. Bleich's remaining count is titled "intentional interference with contractual relations" and asserts that Ms. Davis "intentionally interfer[ed] with" Ms. Bleich's "employment relationship" with FCS.[5] Ms. Bleich alleges that Ms. Davis acted with "malice, hatred, spite, evil motive, and ill will for the principal purpose and with the deliberate intention of wrongfully injuring" Ms. Bleich. It is not alleged that Ms. Davis did not act within the scope of her authority as Executive Director of FCS or contrary to the interests of FCS in firing Ms. Bleich. (Nor did Ms. Bleich offer any evidence of· this.) Indeed, intrinsic to Ms. Bleich's wrongful discharge claim against Ms. Davis, discussed above, is the claim that Ms. Davis, acting pursuant to the authority given her by FCS, played a "dominant role" in the corporate affairs of FCS.

 It is well established that in order to state a cause of action for tortious interference with a business relationship, a plaintiff must allege that a *third party*, without justification and for an unlawful purpose, intentionally interfered with the business relationship between the plaintiff and another, caus-

---

**·5.** Maryland recognizes "two general types of tort actions for interference with business relationships[:] ... inducing the breach of an existing contract and, more broadly, maliciously or wrongfully interfering with economic relationships in the absence of a breach of contract." *Natural Design, Inc. v. Rouse Co.,* 302 Md. 47, 69, 485 A.2d 663 (1984). Ms. Bleich does not claim to have any contractual relationship with FCS. Thus, it seems clear that notwithstanding the title of Count Two, she is asserting a claim for wrongful interference with economic relationships. In any event, although the two torts do have some different elements, *see id.* at 69, 485 A.2d 663, those differences are not at issue here. Accordingly, the parties, not improperly, interchangeably rely on cases involving both torts.

ing the plaintiff actual damage. *See K & K Management v. Lee,* 316 Md. 137, 154–156, 557 A.2d 965 (1989); *Wilmington Trust Co. v. Clark,* 289 Md. 313, 329, 424 A.2d 744 (1981); *Continental Casualty Co. v. Mirabile,* 52 Md.App. 387, 402, 449 A.2d 1176, *cert. denied,* 294 Md. 651, 652 (1982). Maryland courts have "never permitted recovery for the tort of intentional interference with a contract when both the defendant and the plaintiff were parties to the contract." *Wilmington Trust,* 289 Md. at 329, 424 A.2d 774 and numerous cases cited therein; *K & K Management,* 316 Md. at 137, 557 A.2d 965. Thus, when an employee acts within the scope of her employment, or as an agent of her employer, she cannot be held liable for interfering with the contract, business relationships, or economic relationships, between the employer and another. *Continental Casualty Co.,* 52 Md.App. at 402, 449 A.2d 1176; *see also, Borowski v. Vitro Corp.,* 634 F.Supp. 252, 258 (D.Md.1986), *reversed on other grounds,* 829 F.2d 1119 (4th Cir.1987).

None of the out-of-state cases on which Ms. Bleich relies is to the contrary. In only one did the court hold that the plaintiff had stated a cause of action for intentional interference with a business relationship. *See Tash v. Houston,* 74 Mich.App. 566, 254 N.W.2d 579 (1977). There, the employee alleged that her supervisor fired her because she rejected his sexual advances; an intermediate Michigan court held that the "sexual desires of an official simply cannot be equated with the legitimate interests of the organization he represents." *Id.* 254 N.W.2d at 583. Ms. Bleich, of course, makes no remotely similar claim as to Ms. Davis's conduct.

In the remaining cases relied on by Ms. Bleich, there was no holding that the plaintiffs had properly alleged or proved a claim for tortious interference with business relationships against a corporate officer. *See George A. Fuller Co. v. Chicago College of Osteopathic Medicine,* 719 F.2d, 1326, 1333 (7th Cir.1983); *Yaindl v. Ingersoll Rand Co.,* 281 Pa.Super. 560, 422 A.2d 611 (1980); *Sullivan v. Heritage Foundation,* 399 A.2d 856, 861 (D.C.1979). The *Fuller* court noted that in order to make out such a claim, a plaintiff had to allege that

the corporate officers acted out "of personal motive *and without intent to further the interests of their [corporate] principal."* *Fuller,* 719 F.2d at 1333 (emphasis added); *see also Sullivan,* 399 A.2d at 861 (finding summary judgment on claim for a tortious interference with business relationship proper because plaintiff offered no evidence that corporate officer's conduct, even if motivated by malice, was contrary to some "legitimate business purpose"); *Yaindl,* 422 A.2d at 619 & n. 8 (if employee "acted *solely* for his personal benefit" in effecting the discharge of another corporate employee, he would be liable) (emphasis added).

 Here, Ms. Bleich has alleged that Ms. Davis acted with malice and for her own motives but has utterly failed to allege that Ms. Davis's actions were not within the scope of her authority or "without the intent to further the interests of her [corporate] principal." For these reasons, Ms. Bleich has not stated a cause of action for tortious interference with business relationship against Ms. Davis. *See Fuller,* 719 F.2d at 1333; *Sullivan,* 399 A.2d at 861; *Yaindl,* 422 A.2d at 619 & n. 18. *See also Vardi v. Mutual Life Ins. Co.,* 136 A.D.2d 453, 523 N.Y.S.2d 95, 98 (1988) (affirming dismissal of a "cause of action for tortious interference with a contract" for "fail[ure] to allege that the individual defendant was acting outside the scope of his employment"); *Burr v. American Nat'l Theatre & Academy,* 103 N.Y.S.2d 589, 592–93 (N.Y.Sup.Ct.1951) (finding no cause of action because although "the complaint alleges that [the president of the corporate defendant] acted for his own personal interest, ... that means only that he had a personal interest adverse to plaintiffs; not that he had a personal interest adverse to the corporation and was therefore acting against it"). For all of these reasons, the circuit court did not err in granting judgment on the tortious interference with economic relations count.

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART AND REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.

COSTS TO BE PAID BY APPELLEE.