Cynthia E. LEWIS, Plaintiff,

v.

FOREST PHARMACEUTICALS,
INC., et al., Defendants.

No. CIV. S–01–3695.

United States District Court,
D. Maryland,
Northern Division.

Aug. 16, 2002.

David P. Korteling, Caplan, Buckner & Kostecka, Chtd., Bethesda, MD, Plaintiff.

Gary B. Eidelman, Saul Ewing, LLP, Baltimore, MD, Randall S. Thompson, Blackwell, Sanders, Peper, Martin, LLP, St, Louis, MO, for Defendants.

## MEMORANDUM OPINION

SMALKIN, Chief Judge.

This matter comes before the Court on the motion of the defendants, Forest Pharmaceuticals, Inc. ("Forest"), Philip Scholl ("Mr. Scholl"), and Troy Sheldon ("Mr. Sheldon"), for summary judgment. Forest, a Missouri corporation, is a manufacturer and distributor of prescription pharmaceutical products. Messrs. Scholl and Sheldon are and were, at all relevant times, employees of Forest. The plaintiff, Cynthia Lewis ("Ms. Lewis"), a citizen of Maryland and former employee of Forest, is seeking relief for alleged gender and retaliatory discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. §§ 2000e through 2000e–17. She is also seeking relief for various torts allegedly committed by Forest and the other defendants, and for unpaid wages allegedly due her from Forest. The issues have been fully briefed by the parties, and no oral hearing is necessary. Local Rule 105.6 (D.Md.).

## BACKGROUND

To market its products directly to physicians, Forest employs several hundred sales representatives throughout the United States. It assigns each representative to a specific geographical sales territory, where the representative typically calls on over two hundred target physicians. Forest organizes the sales territories into divisions, supervised by division managers, and divisions into regions, supervised by regional directors.

Representatives work out of their homes. Forest provides them a company car, cellular telephone, computer, and various other equipment. Representatives interact with division managers and, to a lesser extent, regional directors, through regular mail, voice mail, e-mail, and telephone communications. Personal contact generally occurs only at periodic divisional, regional, and national sales meetings, and during periodic "ride-alongs," when a division manager or regional director accompanies a representative in the field for observation, evaluation, and coaching.

Forest hired Ms. Lewis as a sales representative in 1991. She performed very well, improving from year to year. In 1996, her territory ranked in the top five percent nationally in sales performance. In February 2000, Forest appointed Mr. Scholl the new division manager of Ms. Lewis's division. Mr. Sheldon was already serving as her regional director.

Ride-alongs with Mr. Scholl, Ms. Lewis claims, differed significantly from ride-

alongs with her previous division manager.[1] When the two were alone in the company car, he regularly spoke to Ms. Lewis about his anus, others' anuses, and anuses in general. He speculated with her what it might feel like to insert various objects into his anus. He told her that he was "getting up [another sales representative's] anus." Lewis Dep. 104. He also spoke regularly to Ms. Lewis about feces and defecation. He told her that he had once worn glue-on fingernails and gotten fecal matter under them when wiping his anus after defecating. He often asked about her bowel movements and told her that he "wanted to have a bowel movement in [her] house." *Id.* at 105.

Mr. Scholl also often spoke to Ms. Lewis about his penis, others' penises, and penises in general—especially when erect. He talked at length about masturbation. On several occasions, he accused Ms. Lewis of staring at his "woody." *Id.* at 104. He often stared at her and told her that he found her beautiful and attractive. Once, he called her a prostitute, who had a "red light flashing outside [her] house." *Id.* at 105. Ms. Lewis repeatedly told him that she found his comments and behavior offensive.

On a ride-along in early October 2000, in the company car, Mr. Scholl leaned over and rubbed her thigh. While doing so, he told her that he was touching her and that he believed she had been looking at his penis. She immediately told him to stop, and he pulled his hand away.

Throughout these months, Mr. Scholl's evaluations of Ms. Lewis's sales abilities, though generally satisfactory, declined steadily. Moreover, as early as April 2000,

her territory had slipped to 522, out of 538 nationwide, in overall sales performance. Defs.' Motion, Ex. E.

On November 2, 2000, Mr. Scholl had another ride-along scheduled with Ms. Lewis. After visiting only one physician, they returned to the car, where Mr. Scholl told her that he found her performance deficient. At that point, Ms. Lewis told him that she felt he was sexually harassing her. She further told him that she was going to file a complaint against him and asked him to get out of the car. Shortly thereafter, he left.

The very next day, Mr. Scholl drafted a "warning letter," detailing shortcomings in Ms. Lewis's performance and threatening at least probation if she failed to improve. Pl.'s Opp'n, Ex. K. A few days later, on November 6, he sent the draft to Mr. Sheldon for review and approval. Mr. Sheldon approved the letter with a few modifications. Then, on November 14, Mr. Scholl sent the draft, edited as directed by Mr. Sheldon, to Joan Williams ("Ms. Williams"), Forest's director of human resources, for her review and approval. Ms. Williams suggested one change, but otherwise approved the letter. Finally, on November 27, 2000, Mr. Scholl mailed a copy of the warning letter to Ms. Lewis.

By coincidence, Mr. Sheldon had a ride-along scheduled with Ms. Lewis two days later. During the ride-along, Mr. Sheldon told her that she brought "no value" to Forest and that she was "substandard." Lewis Dep. 81, 85. The following day, November 30, 2000, Ms. Lewis called in sick and did not work.

1. The plaintiff's and defendants' versions of the facts often diverge. The Court, of course, will present the plaintiff's version whenever the parties' evidence conflicts, at least to the extent that the plaintiff's allegations have sup-port in affidavits, depositions, or other admissible documentary evidence. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

That same day, she faxed a memorandum to both Ms. Williams and Mr. Sheldon complaining of sexual harassment by Mr. Scholl. Defs.' Motion, Ex. J. Mr. Sheldon immediately ordered Mr. Scholl to cease all contact with Ms. Lewis, other than routine business-related voice mails, pending an investigation of her complaint. Ms. Williams immediately began to investigate.

The evening of November 30, Ms. Williams telephoned Ms. Lewis to discuss her specific allegations. Ms. Lewis reiterated and amplified what she had stated in her complaint. She also identified other sales representatives who, she believed, could corroborate her allegations. During the course of their discussion, Ms. Williams asked Ms. Lewis whether she had received the warning letter that Mr. Scholl had mailed on November 27. Ms. Lewis said she had not. Forest sent her another copy of the warning letter via certified mail, which she received on December 20, 2000.

Over the next several days, Ms. Williams spoke to several other employees, including those named by Ms. Lewis, about Mr. Scholl. They uniformly confirmed that Mr. Scholl often spoke about the anus. None, however, perceived his remarks as offensive; none recalled him speaking about matters more explicitly sexual; none felt sexually harassed by him.

On December 9, 2000, Ms. Williams and Mr. Sheldon had a telephone conference with Mr. Scholl to discuss Ms. Lewis's allegations and the results of Ms. Williams's investigation. Mr. Scholl admitted making some of the comments that Ms. Lewis and others had attributed to him, but denied that he had ever propositioned or harassed Ms. Lewis.

Together, Ms. Williams and Mr. Sheldon concluded that Mr. Scholl's verified comments, in and of themselves, were not only inappropriate, but violated Forest's anti-harassment policy. They considered his discharge, but ultimately determined that lesser, though substantial, disciplinary action would adequately address the problem.

On December 15, 2000, Mr. Sheldon informed Mr. Scholl that his tenure as division manager had ended. He further told Mr. Scholl that he had forfeited his quarterly bonus and certain stock options. The immediate financial loss to Mr. Scholl exceeded $28,000. Mr. Sheldon also outlined the terms of Mr. Scholl's continued employment with Forest. Mr. Scholl accepted them.

Soon thereafter, Forest assigned Mr. Scholl to a non-supervisory sales position, where he would not encounter Ms. Lewis. Forest also directed Mr. Scholl to have no contact of any kind with Ms. Lewis—even at company meetings. Finally, it warned Mr. Scholl that any future, verified, inappropriate conduct would result in his immediate termination. Defs.' Motion, Ex. BB.

Also on December 15, 2000, Forest posted an opening for a newly-created specialty sales representative position. Criteria for selection included a clean employment record, with no outstanding performance or disciplinary issues. Unbeknownst to Mr. Sheldon or Ms. Williams, Ms. Lewis applied for the position. However, as soon as the promotion manager learned that Ms. Lewis had a warning letter in her personnel file, he dropped her from consideration. Instead, on January 1, 2001, Forest promoted Dave Ragland ("Mr. Ragland") to the specialty representative position.

In the meantime, at some point in December 2000, Ms. Lewis decided to take her accrued vacation time for the remainder of the calendar year. By letter dated December 27, 2000, Ms. Williams reported

to Ms. Lewis the results of her investigation and the actions that Forest had taken against Mr. Scholl. Defs.' Motion, Ex. U. She also told Ms. Lewis that Mr. Sheldon would serve as her interim division manager until Forest appointed a new division manager to replace Mr. Scholl. *Id.*

As of January 1, 2001, however, Ms. Lewis went on leave of absence. The leave extended into August. Although Forest tried, on several occasions, to persuade her to return to work, she refused. Finally, on August 31, 2001, Forest fired her.

Ms. Lewis timely filed charges of gender and retaliatory discrimination with the Equal Employment Opportunity Commission ("EEOC"). On November 1, 2001, the EEOC issued her a right-to-sue notice. She initiated this action on November 27, 2001, by filing a ten-count complaint, alleging: Count I/II (Sexual Harassment)—gender discrimination in violation of Title VII, against Forest; Count I/II (Retaliation)—retaliatory discrimination in violation of Title VII, against Forest[2]; Count III—wrongful discharge, against Forest; Count IV—defamation, against all three defendants; Count V—intentional infliction of emotional distress, against Forest and Mr. Scholl; Count VI—negligent hiring, training, supervision, and retention, against Forest; Count VII—tortious interference with economic relationships, against all three defendants; Count VIII—violation of the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), 29 U.S.C. §§ 1161 *et seq.*, against Forest; Count IX—violation of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, against Forest; and Count X—violation of the Maryland Wage Payment and Collection Law ("WPCL"), Md.Code Ann., Lab. & Empl. §§ 3–501 through 3–509 (1999), against Forest.

By order dated February 26, 2002, this Court dismissed Counts V and VI. Subsequently, Ms. Lewis has voluntarily dismissed Counts VIII and IX with prejudice.

## SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when there is no genuine issue as to any material fact, and the moving party is entitled to summary judgment as a matter of law. In considering a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505. Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id.* at 252, 106 S.Ct. 2505. In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to

---

**2.** The plaintiff has styled Count I "Quid pro Quo," and Count II "Hostile Work Environment." Both, of course, are subspecies of sexual harassment, which itself is a species of gender discrimination. *See infra.* Although she does not specifically so state in Counts I and II, her complaint elsewhere asserts a separate claim of retaliation in violation of Title VII. Compl. ¶ 5. And both parties address that claim in their arguments on the motion now before the Court. The Court will therefore refer to the plaintiff's Title VII claims as "Count I/II (Sexual Harassment)," encompassing both the *quid pro quo* and hostile work environment subspecies, and "Count I/II (Retaliation)."

the party opposing the motion," *Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348, but the opponent must bring forth evidence upon which a reasonable fact finder could rely, *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548. The mere existence of a "scintilla" of evidence in support of the nonmoving party's case is not sufficient to preclude an order granting summary judgment. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

## ANALYSIS

### A. *Title VII*

In Counts I and II of her complaint, Ms. Lewis alleges that Forest, in violation of Title VII, discriminated against her on the basis of her gender, and then retaliated against her for complaining about such discrimination. The Court examines each claim in turn.

#### 1. *Discrimination Based on Gender: Sexual Harassment*

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to . . . compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e–2(a)(1). Sexual harassment—the imposition of an unwanted condition on a person's employment because of that person's gender—represents one form of illegal gender discrimination. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).

Sexual harassment encompasses a broad spectrum of behavior. Within the spectrum, two categories of conduct emerge with some (though imperfect) clarity: *quid pro quo* harassment and hostile work environment harassment. The former occurs when a superior tangibly punishes an employee for rebuffing his or her sexual advances or tangibly rewards an employee for submitting (unwillingly) to them. The latter occurs when sexually demeaning behavior so infects an employee's work environment as to render it hostile or abusive.

#### a. *Quid pro Quo Harassment*

To establish a *prima facie* case of *quid pro quo* harassment, the plaintiff must prove: (1) that she was subjected to unwelcome sexual advances; (2) that her reaction to those advances effected a tangible employment action; and (3) that some basis exists for imputing liability to the employer.[3] *See Spencer v. Gen. Elec. Co.*, 894 F.2d 651, 658 (4th Cir.1990), *abrogated on other grounds by Farrar v. Hobby*, 506 U.S. 103, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992). If the plaintiff proves that her reaction to a supervisor's sexual advances culminated in a tangible employment action, she need not prove the third element; vicarious liability automatically attaches to the employer. *Faragher v. City of Boca Raton*, 524 U.S. 775, 808, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

Once a *prima facie* case is made, an inference of illegal discrimination arises.

---

**3.** Variants of the *prima facie* case also include proof that the plaintiff belongs to a protected group and proof that the sexual advances were based on the plaintiff's gender. *See, e.g., Spencer*, 894 F.2d at 658. The first seems illogical: generally, a person must be either male or female, and so cannot but belong to a protected group. (Those of "transgender" would appear to belong to a protected group

as well, but that need not concern us here.) The second seems tautological: sexual advances spring from sexual desires and seek sexual activity; if conduct may reasonably be construed as a sexual advance, it must be based on the gender of the person to whom it is directed. A heterosexual man propositions a woman *because she is a woman.*

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The defendant must then articulate a legitimate, non-discriminatory reason for the employment action in question. *Id.* at 802–03, 93 S.Ct. 1817. If the defendant meets this less-than-ponderous burden of production, the inference of discrimination is dispelled, and the plaintiff, who bears the ultimate burden of persuasion, must finally show that the proffered explanation is but a pretext for intentional discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

Of course, evidence of pretext, combined with the plaintiff's *prima facie* case, does not compel judgment for the plaintiff; "[i]t is not enough ... to *dis*believe the employer; the factfinder must [also] *believe* the plaintiff's explanation of intentional discrimination." *Reeves*, 530 U.S. at 147, 120 S.Ct. 2097 (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 519, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)) (internal quotation marks omitted). However, in appropriate circumstances, "a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* at 148, 120 S.Ct. 2097.

Ms. Lewis has asserted that her immediate supervisor, Mr. Scholl, on several occasions, stared at her and told her that she was beautiful and attractive. Lewis Dep. 115–16. While she and Mr. Scholl were alone together in her company car, she has also asserted that he often spoke about his erections. *Id.* at 104. Ms. Lewis repeatedly and consistently told him that she found his comments and behavior offensive. During the ride-along in early October 2000, again while the two of them were alone in the car, Ms. Lewis has stated that Mr. Scholl leaned over, rubbed her thigh, said that he was touching her thigh, and told her that he thought she was looking at his penis. *Id.* at 111, 171. She immediately told him to stop, and he pulled his hand away. *Id.* at 111, 114.

▪ Sexual advances need not explicitly request sex. *Lipsett v. Univ. of P.R.*, 864 F.2d 881, 905–06 (1st Cir.1988). Words and actions that implicitly proposition suffice. *Id.* And Mr. Scholl's behavior more than suffices.

Sexual advances are unwelcome if "the employee did not solicit or incite [them] ... and ... the employee regarded [them] as undesirable or offensive." *Henson v. City of Dundee*, 682 F.2d 897, 903 (11th Cir.1982). Evidence of unwelcomeness comes from the plaintiff's response to the advances. *Meritor Sav. Bank, FSB*, 477 U.S. at 68, 106 S.Ct. 2399. Here, Ms. Lewis's consistent verbal protestations readily establish the unwelcomeness of Mr. Scholl's conduct. Ms. Lewis has therefore advanced sufficient evidence of the first element of a *prima facie* case of *quid pro quo* harassment.

To establish the second element, Ms. Lewis posits three decisions as tangible employment actions: the placement of the warning letter in her personnel file; her consequent disqualification for promotion to specialty sales representative; and her ultimate termination. A tangible employment action constitutes an obvious and significant change in employment status. *Burlington Indus., Inc.*, 524 U.S. at 761, 118 S.Ct. 2257. An employer's act must materially alter the terms, conditions, or benefits of employment to qualify as "tangible." *See id.; see also Von Gunten v. Maryland*, 243 F.3d 858, 866 (4th Cir. 2001). Inquiry into the tangible nature of the action (when adverse) typically focuses on whether the employee has suffered discharge, demotion, decrease in pay or ben-

efits, loss of job title or supervisory responsibility, or reduced opportunities for promotion. *Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir.1999).

■ Irrefutably, Ms. Lewis's termination is a tangible employment action. So, too, is the denial of a promotion. Forest argues, however, that the warning letter is not. The letter, it contends, merely outlined deficiencies in Ms. Lewis's sales work which had long gone uncorrected; it involved no financial penalty.

■ Reprimands, whether oral or written, do not *per se* significantly affect the terms or conditions of employment. *Nye v. Roberts*, 159 F.Supp.2d 207, 213 (D.Md. 2001); *see also Hopkins v. Balt. Gas & Elec. Co.*, 77 F.3d 745, 755 (4th Cir.1996) (affirming that a formal disciplinary letter *subsequently removed* from an employee's personnel file is not a tangible action); *but see Johnson v. DiMario*, 14 F.Supp.2d 107, 110 (D.D.C.1998) (finding that a written warning placed in an employee's personnel file qualifies as a tangible employment action); *Fowler v. Sunrise Carpet Indus., Inc.*, 911 F.Supp. 1560, 1582 (N.D.Ga.1996) (finding that a written reprimand threatening termination, even if later withdrawn, may qualify as a tangible employment action because such a reprimand "make[s] the future loss of tangible benefits more likely"). Such an automatic rule would unduly inhibit criticism of employees, which is a "normal incident of the working relationship between supervisors and those in their charge." *Nelson v. Univ. of Me. Sys.*, 923 F.Supp. 275, 282 (D.Me.1996). However, if evidence shows that a reprimand not only bruises an employee's ego or reputation, but also works a real, rather than speculative, employment injury, the reprimand becomes a tangible employment action.

The warning letter issued by Mr. Scholl did more than bring certain deficiencies to Ms. Lewis's attention. It did more than harm her ego. Once placed in her personnel file, it rendered her ineligible for promotion to a position for which she was otherwise qualified (and for which she actually applied—albeit knowing that her file contained a disqualifying warning letter). The specialty representative position was open only to those employees who had "[n]o outstanding performance/disciplinary issues." Defs.' Motion, Ex. R. This criterion illustrates the real, deleterious effect of a warning letter in an employee's record: it can absolutely bar advancement. Furthermore, the penultimate paragraph of Ms. Lewis's letter concluded: "Without immediate adjustment to your behavior, further disciplinary actions, including probation, will result." Pl.'s Opp'n, Ex. K. The threat of yet more tangible action is clear.

Both because the letter so demonstrably impeded Ms. Lewis's ability to advance, and because it so imminently threatened probation if she failed to mend her ways, it qualifies as a tangible employment action. *See Boone*, 178 F.3d at 255; *Rivers v. Balt. Dep't of Recreation & Parks*, No. R–87–3315, 1990 WL 112429, at *10 (D.Md.1990) (finding that a letter threatening suspension if the employee's conduct is not corrected constitutes a tangible employment action).

■ To establish the second element of her *prima facie* case, however, Ms. Lewis must do more than establish a tangible employment action. She must also show a causal connection between her rejection of Mr. Scholl's sexual overtures and the various employment actions she has suffered. Her proof succeeds with respect to the warning letter and lost promotion, but falters with respect to her final discharge.

An inference of causation arises if the unwelcome sexual advances proximately

preceded the tangible employment action and the alleged harasser made or substantially influenced the relevant decision. *See Dowe v. Total Action Against Poverty in Roanoke Valley,* 145 F.3d 653, 657 (4th Cir.1998) (discussing proof of causation in the context of a Title VII retaliation claim). Mr. Scholl most obviously propositioned Ms. Lewis when he touched her suggestively in early October 2000. And Ms. Lewis immediately and decisively rebuffed him. About one month later, on November 3, Mr. Scholl himself wrote the damaging reprimand. The short time lapse and the identity of author and alleged harasser suffice to establish *prima facie* causation.

If the decision to issue the warning letter stemmed *prima facie* from gender-discriminatory animus, the decision not to promote Ms. Lewis ineluctably was tainted *prima facie* by the same animus, given that the letter had the effect of absolutely barring her promotion. The promotion manager, though applying ostensibly neutral selection criteria and harboring no illegal intent himself, did not make the promotion decision alone. Mr. Scholl exercised a proleptic veto. His letter "disqualified" Ms. Lewis, eliminating her from further consideration. *See Sowers v. Kemira, Inc.,* 701 F.Supp. 809, 823 (S.D.Ga.1988) (finding causal link sufficient when alleged harasser, though not the ultimate decision maker, had a "great amount of influence" over the decision). And Ms. Lewis met, at least minimally, all other qualifications for the specialty representative position.[4]

Forest fired Ms. Lewis some eleven months after Mr. Scholl allegedly fondled her thigh, some nine to ten months after he issued the warning letter. Much occurred in the interval. Critically, Ms. Lewis filed her internal complaint of sexual harassment. Forest promptly investigated, substantially verified her allegations, and took adequate (if, perhaps, imperfect) remedial action. It demoted Mr. Scholl to a non-supervisory sales position, assigned him a territory geographically distinct from Ms. Lewis's, penalized him financially, admonished him about his behavior, and enjoined him from any future contact with Ms. Lewis.[5] More critically still, Ms. Lewis stopped working.

---

**4.** Forest's argument to the contrary is without merit. Forest contends that because Ms. Lewis was unable to work from January to April 2001 and "refused" to work thereafter, she could not have served as specialty sales representative. Defs.' Motion 31. Forest made its final promotion decision, however, before January 1, 2001; neither the promotion manager, nor any other Forest employee, could have foreseen Ms. Lewis's extended leave of absence.

**5.** If Ms. Lewis had not suffered tangible employment action causally related to the sexual harassment, and Forest were thus entitled to assert the *Faragher/Burlington Industries* affirmative defense to liability, the evidence shows that Forest would be able to establish the defense as a matter of law. The defense comprises two essential elements: "that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and ... that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher,* 524 U.S. at 807, 118 S.Ct. 2275; *Burlington Indus., Inc.,* 524 U.S. at 765, 118 S.Ct. 2257.

As to the first element, the record reflects that Forest had in place an anti-harassment policy (including a complaint procedure) designed to deter sexual harassment. Defs.' Motion, Ex. AA. Ms. Williams has testified that a copy of the policy is distributed to all employees on the day they are hired. Williams Dep. 40–41. Although Ms. Lewis cannot recall whether she received a copy at that time, she concedes that when she requested a copy in October 2000, she received it promptly. Lewis Dep. 154. No evidence suggests that Forest adopted or administered the policy in bad faith. *See Brown v. Perry,*

Believing Forest's remedial action inadequate, she took an extended leave of absence. From January 1, 2001, until Forest discharged her on August 31 of the same year, she remained unable or unwilling to return to work. Throughout, Forest assured her that, if she returned, she would be reinstated to her previous sales territory. Defs.' Motion, Ex. Y. The fact that another employee had been assigned to cover her territory in her absence does not belie that assurance. At last, Forest released her—not because she refused to accede to any sexual demands of Mr. Scholl, not because the warning letter he had authored so disparaged her sales ability, and not because anyone wanted to retaliate against her for complaining about sexual harassment. Forest fired her because she unreasonably refused to do her job. Defs.' Motion, Ex. EE.

Her protracted absence—an expression of her dissatisfaction with the remedial measures that Forest had taken in response to her complaint—clearly shows that she was not performing her job so as to meet her employer's legitimate expectations. Title VII does not immunize an employee's unilateral decision to stay away from work in protest of an employer's remedial actions, especially when the employer has punished the offending party and removed him from the employee's immediate working environment. As to the final discharge, then, Ms. Lewis has failed to make out a *prima facie* case of discrimination, entitling Forest to summary judgment.

▇ Nevertheless, Ms. Lewis has successfully established a *prima facie* case of *quid pro quo* sexual harassment leading to the issuance of the warning letter and the denied promotion. To dispel the consequent inference of wrongdoing, Forest has offered legitimate, non-discriminatory explanations for both employment actions. Forest maintains that Ms. Lewis's sales performance was so deficient as to justify the issuance of the letter and the denial of the promotion. It claims, further, that the qualifications of the person selected for the specialty representative position eclipsed those of Ms. Lewis.

184 F.3d 388, 396 (4th Cir.1999). Moreover, when Ms. Lewis lodged her complaint, Forest responded with celerity and sincerity.

As to the second element, Ms. Lewis contends that Forest's response failed to provide her reasonable assurance that Mr. Scholl's harassment would not recur because she might still have encountered him at periodic company meetings (between three and fifteen each year), some requiring overnight hotel stays. These meetings, however, would have included many other employees. In no way would Ms. Lewis have been isolated (as she had been in the company car) with Mr. Scholl. Moreover, Mr. Scholl had been strictly ordered not to speak to her, not to look at her, and not to approach her at any meeting they both attended. Scholl Dep. 322–23; Defs.' Motion, Ex. Y. Granted, Forest did not fire Mr. Scholl. Its response might not have been as effective as possible, but it seems pretty darn good. *See Mikels v. City of Durham,* 183 F.3d 323, 329–30 (4th Cir.1999)

(affirming summary judgment for employer when employee had suffered no tangible employment action and employer promptly investigated employee's complaint, reprimanded and suspended harasser, and, upon his return to work, reassigned him to post removed from victim); *Savino v. C.P. Hall Co.,* 199 F.3d 925, 933 (7th Cir.1999) (holding that "Title VII does not require that the employer's response to a plaintiff's complaints of supervisory sexual harassment successfully *prevented subsequent harassment,* only that the employer's actions were reasonably likely to check future harassment"). And Ms. Lewis, unreasonably, never gave Forest's remedial actions a chance to work. *See Phillips v. Taco Bell Corp.,* 156 F.3d 884, 890–91 (8th Cir.1998) (asserting that an employee must afford the employer a fair opportunity to demonstrate that its reasonable corrective actions would remedy the harassment). After December 2000, she never returned to work.

Although evaluations of Ms. Lewis from Mr. Scholl prior to the warning letter indicate that she was meeting or even slightly exceeding company expectations, his ratings of her various sales skills nevertheless decline over time. In October 2000, the ratings in all but one category hover at or just above "standard." Defs.' Motion, Ex. E. In "pre-calling," Mr. Scholl for the first time evaluates Ms. Lewis "substandard." *Id.* Moreover, Mr. Sheldon asserts that he verified at least some of Mr. Scholl's observations of Ms. Lewis's alleged deficiencies when he rode along with her on November 29, 2000—one day before she filed her internal complaint. Sheldon Dep. 156–57; Lewis Dep. 81, 85.

Neither party has provided the Court much guidance in interpreting and comparing evaluation numbers. Nevertheless, the raw numbers of Mr. Ragland, whom Forest selected as specialty sales representative, indisputably surpass those of Ms. Lewis.[6] Furthermore, in September 2000, Ms. Lewis's sales territory ranked only 521, out of 538 nationwide, in overall sales performance. Defs.' Motion, Ex. E. Mr. Ragland's territory, on the other hand, ranked much higher. Mr. Ragland, that is, not only had better "subjective" evaluation numbers than Ms. Lewis, tainted, perhaps, by the bias of the evaluator; he had better "objective" numbers as well. And while such "objective" sales data *may* not accurately reflect a sales representative's selling skills—even a good salesperson may make fewer sales in a territory populated with tough customers—they may. An employer, Forest submits, in promoting a sales representative to a specialty sales position, would ignore such data at its peril.

Forest's asserted justifications for its actions eliminate the presumption of discrimination raised by Ms. Lewis's *prima facie* case. Ms. Lewis, however, points to evidence that, she contends, demonstrates that the proffered justifications are merely pretextual. She notes, first, that the alleged harasser himself, Mr. Scholl, assigned her the relevant evaluation numbers.

Second, she observes that Mr. Sheldon's testimony about what he observed on November 29, 2000, corroborates only some of Mr. Scholl's criticisms in the warning letter. The letter delineates three "areas of concern." Pl.'s Opp'n, Ex. K. Mr. Scholl criticizes Ms. Lewis: first, for failing to work cooperatively with the "mirror" sales representative in her territory; second, for failing to "pre-call plan" effectively before visiting physicians; and third, for behaving unprofessionally and disrespectfully toward him—her division sales manager. *Id.* Mr. Sheldon, however, criticizes her solely for missing sales opportunities—a deficiency related, perhaps, to ineffective "pre-call planning," but unrelated to Mr. Scholl's other areas of concern. Sheldon Dep. 156–57.

Third, Ms. Lewis argues that a comment Mr. Sheldon made to her calls into question his good faith. She asserts that, during the course of Forest's investigation of her complaint, Mr. Sheldon told her that "he was not going to let the letter of warning fall through the cracks." Lewis Dep. 173. Two reasonable inferences, it

---

6. The requirements for the specialty sales position include scores of "3.0 in latest field trip evaluation for territory management, selling skills and product knowledge." Defs.' Motion, Ex. R. (The rating scale in these categories ranges from 5.0—"outstanding," to 1.0—"unacceptable." The mid-range score of 3.0 represents "standard.") Ms. Lewis's most recent scores, dating from the ride-along with Mr. Scholl on October 26, 2000, were 3.11, 3.07, and 3.08, respectively; Mr. Ragland's, dating from a ride-along on November 8, 2000, were 3.8, 3.5, and 3.58, respectively. *Id.* Ex. S.

seems, follow. On the one hand, the comment may indicate that Mr. Sheldon genuinely believed that Ms. Lewis merited the warning letter—so much so that he was unwilling to rescind it even as evidence of its author's "inappropriate" conduct, Defs.' Motion, Ex. BB, toward Ms. Lewis mounted. On the other hand, it may indicate that Mr. Sheldon thought that Ms. Lewis did not really deserve the letter, but that he intended, nonetheless, to preserve it. This latter inference implies, in turn, not only that Ms. Lewis's deficiencies (to the extent they existed) were not so profound, but also that Mr. Sheldon was retaliating against her for lodging her complaint. *See infra.* To Mr. Scholl's (and so, vicariously, Forest's) gender-discriminatory animus, a retaliatory animus is added.[7] However weak this inference may be, it is not unreasonable. And, at this stage in the proceeding, the Court must draw all reasonable inferences in favor of Ms. Lewis. *See Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348.

Finally, with regard to the promotion decision in particular, Ms. Lewis observes that Forest never assessed the full range of her qualifications vis-à-vis Mr. Ragland. The criteria for selection extended well beyond mere evaluation and sales performance numbers. Candidates were also to be judged on the bases of their "[p]ositive communication and teamwork skills," their documented "[o]rganiz[ation] and implement[ation of] a variety of programs," and, perhaps most significantly, their "[o]bserved performance via [the] formal interview process." Defs.' Motion, Ex. R. The promotion manager, however, never evaluated Ms. Lewis on any of these bases—not even on the basis of her numbers. The disqualifying warning letter preempted

any meaningful comparison of Ms. Lewis with Mr. Ragland or any other candidates. As soon as the promotion manager discovered the letter, her candidacy ended. Smith Dep. 72, 109–10. Indeed, but for the warning letter, the promotion manager has testified, he "would have taken [Ms. Lewis] further in the [promotion] process." *Id.* at 121–22.

A rational trier of fact, therefore, could conclude that Forest's nondiscriminatory explanations for the issuance of the warning letter and the denial of the promotion are a pretext for illegal *quid pro quo* sexual harassment. With respect to both actions, then, summary judgment is inappropriate.

### b. *Hostile Work Environment*

To establish a *prima facie* case of hostile work environment harassment, the plaintiff must prove: (1) that she was harassed "because of" her gender; (2) that the harassment was unwelcome; (3) that the harassment was sufficiently severe or pervasive to create an abusive working environment; and (4) that some basis exists for imputing liability to the employer. *Smith v. First Union Nat'l Bank,* 202 F.3d 234, 241 (4th Cir.2000). Ms. Lewis has satisfied the fourth element by proving that Mr. Scholl's harassment culminated in a tangible employment action. *Faragher,* 524 U.S. at 808, 118 S.Ct. 2275; *Burlington Indus., Inc.,* 524 U.S. at 765, 118 S.Ct. 2257. Therefore, if she otherwise demonstrates that Mr. Scholl's behavior created a hostile work environment, her employer is automatically liable for any damages she suffered as a result. *Faragher,* 524 U.S.

---

**7.** If Mr. Scholl wrote the warning letter because Ms. Lewis had rejected his sexual advances, and Mr. Sheldon approved the letter and/or retained it in Ms. Lewis's file because she had complained about Mr. Scholl, the prior gender-discriminatory motive still survives; the later retaliatory motive does not expunge or supersede it.

at 808, 118 S.Ct. 2275; *Burlington Indus., Inc.*, 524 U.S. at 765, 118 S.Ct. 2257.

The *McDonnell Douglas* burden-shifting paradigm cannot logically apply to claims of hostile work environment. There simply is no legitimate business justification for severe or pervasive sexual harassment. *See Stacks v. Southwestern Bell Yellow Pages, Inc.*, 27 F.3d 1316, 1326 (8th Cir. 1994); *Bowen v. Valley Camp of Utah, Inc.*, 639 F.Supp. 1199, 1203 n. 8 (D.Utah 1986). Thus, once the plaintiff has established a *prima facie* case, her proof suffices to withstand the employer's motion for summary judgment.

■ Forest advances two reasons why Mr. Scholl did not harass Ms. Lewis "because of" her gender: first, because many of the comments Mr. Scholl made are not sexual in nature but merely vulgar; and second, because he directed such comments toward both men and women, often in group settings. Yet conduct need not be overtly sexual to amount to actionable harassment. Likewise, a supervisor generally obnoxious to men and women alike may also be gender-specifically obnoxious to a particular man or woman. *See Lack v. Wal–Mart Stores, Inc.*, 240 F.3d 255, 262 (4th Cir.2001). In the final analysis, actionable harassment encompasses all forms of intimidating, denigrating conduct directed at an individual because of that individual's gender. *See id.* at 261 (reiterating that "the critical issue ... is 'whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed' ") (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 25, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (Ginsburg, J., concurring)). Forest's argument fails because it ignores the details of the conduct Ms. Lewis complains of.

While many of Mr. Scholl's comments are indeed no more than coprophilic, many are graphically sexual. He spoke not only of matters anal and fecal *per se*, he spoke also of inserting things into his rectum. He spoke of his own erections, others' erections, and masturbation. He described to Ms. Lewis two scenes from the movie American Pie (Universal Pictures 1999), one involving a boy masturbating with the eponymous pastry, another involving a girl masturbating "with a flute in her pussy." Lewis Dep. 103; Scholl Dep. 400; Williams Dep. 123.

And while Mr. Scholl often addressed his crude scatological remarks to others, including some men, his explicitly sexual remarks he reserved for Ms. Lewis alone. Other employees have stated that Mr. Scholl spoke to them of anuses, asses, and flatulence; none has stated that he ever spoke of penises, pussies, or masturbation. Defs.' Motion, Ex. K; Tibbs Aff. ¶¶ 9–11; Wason Aff. ¶¶ 7–8; Solomon Aff. ¶¶ 4, 6, 10; Gorgei Aff. ¶¶ 5–6; Nusbaum Aff. ¶¶ 6–8. Nor have any employees other than Ms. Lewis asserted that Mr. Scholl told them he found them beautiful or attractive. Comparative evidence thus shows that Mr. Scholl was not indiscriminately vulgar and offensive. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80–81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (approving the use of such comparative evidence to demonstrate how an alleged homosexual harasser treated members of both sexes); *Lack*, 240 F.3d at 262. He discriminated carefully. He treated one woman differently—because she was a woman.

Most significantly, however, Mr. Scholl touched one person, and one person only, in a suggestive manner—Ms. Lewis. This "earnest sexual solicitation" readily supports the inference that he harassed Ms. Lewis because of her gender. *Tietgen v. Brown's Westminster Motors, Inc.*, 921 F.Supp. 1495, 1502 (E.D.Va.1996).

Ms. Lewis repeatedly told Mr. Scholl that she considered his words and actions offensive. She has therefore established the second element of a *prima facie* case of hostile work environment: she in no way welcomed Mr. Scholl's behavior. *See Swentek v. USAIR, Inc.*, 830 F.2d 552, 557 (4th Cir.1987).

To determine whether the harassment was sufficiently severe or pervasive, a court must look to a totality of the circumstances. *Harris*, 510 U.S. at 22–23, 114 S.Ct. 367; *Smith*, 202 F.3d at 242. These circumstances include: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance or significantly affects the employee's psychological well-being. *Harris*, 510 U.S. at 23, 114 S.Ct. 367; *Smith*, 202 F.3d at 242; *Paroline v. Unisys Corp.*, 879 F.2d 100, 105 (4th Cir.1989), *abrogated in part on other grounds*, 900 F.2d 27 (4th Cir.1990) (en banc). The list, of course, is nonexhaustive, and no single circumstance is necessary. *Harris*, 510 U.S. at 23, 114 S.Ct. 367. Nevertheless, the court must not focus solely on the victim's subjective reaction; it must examine all the circumstances from two viewpoints: the victim's, and a reasonable person's. *Paroline*, 879 F.2d at 105.

In the instant case, two circumstances in particular stand out. First, the most egregious conduct Ms. Lewis complains of occurred when she and Mr. Scholl were alone together in the close confines of an automobile. There, Mr. Scholl rubbed her thigh; there, he said she was looking at his penis; there, he talked about his erections; there, he discoursed on self-stimulation. The same conduct by a supervisor in a busy, crowded office may not amount to much. Context, however, determines im-

port. And no small contextual rift separates a car occupied by a lone subordinate from a work space occupied by many. In the car, a reasonable person, who objects, may well find the conduct abusive—even frightening. *Cf. Hopkins*, 77 F.3d at 754 (finding incidents of alleged harassment insufficiently severe or pervasive, in part because several of them occurred in group settings, where only the victim perceived them to be directed at him).

Second, Ms. Lewis was not working in a traditional employment environment. She never labored in an office or a factory. She worked out of her home, and out of the car that Forest provided her. Only during the mandated, periodic ride-alongs would she come into direct contact with company supervisors in their supervisory role. Only then would a meaningful "work environment" materialize. Granted, between February and November 2000, Mr. Scholl had only six ride-alongs, totaling ten days, with Ms. Lewis. Pl.'s Opp'n, Ex. R. Those ten days, however, constitute the entire temporal span of Ms. Lewis's work environment during those months. And, she claims, on every one of those ten days, Mr. Scholl harassed her. Harassment and work environment thus coextend. Ms. Lewis has therefore established a *prima facie* case of hostile work environment sexual harassment.

### 2. *Discrimination Based on Protected Activity: Retaliation*

Title VII also prohibits an employer from retaliating against employees who exercise their Title VII rights. In particular, it makes it unlawful "for an employer to discriminate against any of his employees ... because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" related to Title VII. 42 U.S.C. § 2000e–3(a). An employee need

not have instituted formal proceedings under Title VII to invoke the protection of its retaliation provision; informal complaints to the employer suffice. *Armstrong v. Index Journal Co.*, 647 F.2d 441, 448 (4th Cir.1981). Nor does the employee's underlying discrimination claim have to be meritorious to prevail on a claim of retaliation for opposition to perceived discrimination. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 357 n. 1 (4th Cir.1985).

Lacking ordinary direct or indirect evidence of Forest's retaliatory intent, Ms. Lewis relies on the familiar *McDonnell Douglas* paradigm to establish her claim of retaliation. Demonstration of a *prima facie* case gives rise to an inference of retaliation, which the defendant may dispel by articulating a legitimate, non-retaliatory reason for its action. *McDonnell Douglas Corp.*, 411 U.S. at 802–03, 93 S.Ct. 1817; *Causey v. Balog*, 162 F.3d 795, 800 (4th Cir.1998). The ultimate burden of persuasion, of course, remains on the plaintiff. *Reeves*, 530 U.S. at 143, 120 S.Ct. 2097; *Murrell v. Ocean Mecca Motel, Inc.*, 262 F.3d 253, 258–59 (4th Cir.2001).

To prove a *prima facie* case of retaliation, the plaintiff must show: (1) that she engaged in a protected activity; (2) that the employer took adverse employment action against her; and (3) that a causal connection existed between the protected activity and the adverse action. *Causey*,

162 F.3d at 803. Forest does not dispute that Ms. Lewis engaged in protected activity when she told Mr. Scholl that she intended to file a complaint of harassment and when she actually filed the complaint. To meet the second requirement, Ms. Lewis reiterates the tangible actions that she has offered in her sexual harassment claim. Just as the discharge, denied promotion, and warning letter are legally "tangible," so too they are legally "adverse." [8]

■ The plaintiff may demonstrate *prima facie* causation in a claim of retaliation much the same way as in a claim of *quid pro quo* sexual harassment: by showing that the protected activity occurred shortly before the adverse actions, and that the relevant decision maker was aware of it. *Dowe*, 145 F.3d at 657. During the fateful ride-along on November 2, 2000, Ms. Lewis asserts, she told Mr. Scholl that she felt he was sexually harassing her, that she planned to file a complaint against him, and that she wanted him immediately to get out of the car. Lewis Dep. 236. Mr. Scholl himself has testified that he began drafting the warning letter the following day. Scholl Dep. 266. Moreover, sometime after Mr. Sheldon learned that Ms. Lewis had filed her complaint, he warned her that he was not going to let the letter "fall through the cracks." Lewis Dep. 173. Though perhaps innocuous, as the Court

---

8. The set of "tangible employment actions" overlaps, but clearly does not match, the set of "adverse employment actions." "Tangible" employment actions, for example, need not be adverse. An employer is liable for sexual harassment both when an employee garners a tangible job benefit because the employee submitted to a supervisor's sexual advances and when an employee suffers a tangible job detriment because the employee rebuffed sexual advances. *Burlington Indus., Inc.*, 524 U.S. at 761, 118 S.Ct. 2257; *Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 267–68 (4th Cir.2001). Furthermore, in

the context of a sexual harassment claim, "tangible" employment actions do not include the creation and maintenance of a hostile work environment. *Burlington Indus., Inc.*, 524 U.S. at 760–63, 118 S.Ct. 2257; *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275. In the context of a retaliation claim, however, "adverse" employment actions may include harassment that creates a hostile work environment. *Von Gunten*, 243 F.3d at 869–70. Nevertheless, the three employment actions to which Ms. Lewis points are both "tangible" and "adverse."

has already noted, the comment nonetheless is reasonably susceptible of a more sinister, retaliatory meaning. *See supra.*

Her proof of causation extends, for the same reasons as in her claim of sexual harassment, both to the warning letter and the lost promotion. Again for the same reasons, however, it does not extend to her termination. Ms. Lewis has therefore established a *prima facie* case of retaliation as to the warning letter and the denied promotion.

Just as she carries or fails to carry her ultimate burden of persuasion in the sexual harassment claim, so too in the retaliation claim. Therefore, she can withstand Forest's motion for summary judgment as to the warning letter and the denied promotion. As to her final discharge, Forest is entitled to summary judgment.

B. *Wrongful Discharge*

 Under Maryland law, to establish her claim of wrongful discharge, Ms. Lewis, as an at-will employee, must demonstrate that the motivation for her discharge contravenes some clear mandate of public policy. *Adler v. Am. Standard Corp.*, 291 Md. 31, 47, 432 A.2d 464 (1981). Moreover, she must demonstrate that the public policy she seeks to vindicate by her tort action would not otherwise be vindicated by some statutory remedy. *Makovi v. Sherwin–Williams Co.*, 316 Md. 603, 605, 561 A.2d 179 (1989). Thus, if discrimination prohibited by Title VII is the sole motivation for an employee's discharge, the statute creates both the right and the remedy for its violation; the employee cannot also sue for wrongful discharge. *Id.* at 626, 561 A.2d 179.

 Sometimes, of course, the facts underlying a discharge constitute both a violation of Title VII and of another mandate of public policy, independent of the anti-discrimination law. *Id.* at 620, 561

A.2d 179. In such circumstances, the terminated employee *can* sue for wrongful discharge. *Watson v. Peoples Sec. Life Ins. Co.*, 322 Md. 467, 486, 588 A.2d 760 (1991). The tort action reinforces, rather than duplicates, the public policy expressed in Title VII. *Id.* For example, the tort may lie when an employee is fired in retaliation for bringing suit against a supervisor whose workplace sexual harassment culminates in assault and battery. *Id.* at 480–81, 588 A.2d 760. Such conduct contravenes not only Title VII, but also "the individual's interest in preserving bodily integrity and personality" and "the state's interest in preventing breaches of the peace." *Id.* at 481, 588 A.2d 760. Similarly, the tort may lie when an employee is fired because she resists *quid pro quo* sexual advances that amount to an invitation to engage in prostitution. *Insignia Residential Corp. v. Ashton*, 359 Md. 560, 573, 755 A.2d 1080 (2000).

 Here, even if the Court assumes that Mr. Scholl assaulted, battered, and attempted to coerce Ms. Lewis into an act of prostitution, no causal nexus links her reaction to such behavior to her ultimate discharge. *See supra.* Forest did not fire her because she rebuffed Mr. Scholl's advances or because she sought to redress his misconduct through her complaint. Forest fired Ms. Lewis because, after an eight-month leave of absence, she unreasonably refused to return to work. So far from contravening any mandate of public policy, Forest's motivation for terminating her employment accords perfectly well with public policy. Ms. Lewis's claim of wrongful discharge must therefore fail.

C. *Defamation*

 Under Maryland law, to establish a *prima facie* case of defamation when the plaintiff is not a public figure, the

plaintiff must prove: (1) that the defendant made a defamatory statement to a third person; (2) that the statement was false; (3) that the defendant was at least negligent in making the statement; and (4) that the plaintiff consequently suffered harm. *Gohari v. Darvish*, 363 Md. 42, 54, 767 A.2d 321 (2001); *see also Jacron Sales Co. v. Sindorf*, 276 Md. 580, 596–97, 350 A.2d 688 (1976). A defamatory statement "tends to expose a person to public scorn, hatred, contempt or ridicule, thereby discouraging others in the community from having a good opinion of, or associating with, that person." *Rosenberg v. Helinski*, 328 Md. 664, 675, 616 A.2d 866 (1992).

■■■■ The defendants assert that the warning letter is no more than a mere statement of opinion and, therefore, incapable of defamatory meaning. In the letter, however, Mr. Scholl not only opines that Ms. Lewis has been performing her employment duties poorly; he also sets forth specific facts upon which he bases his opinion. And Ms. Lewis contends that Mr. Scholl has fabricated some, or all, of these facts.

■■■■ Furthermore, a statement that "adversely affects [an employee's] fitness for the proper conduct of his [or her] business . . . . [is] actionable *per se.*" *Hearst Corp. v. Hughes*, 297 Md. 112, 118, 466 A.2d 486 (1983). Of course, not every negative evaluation of an employee's performance is potentially defamatory. *Leese v. Balt. County*, 64 Md.App. 442, 474, 497 A.2d 159 (1985). Rather, "[t]he words must go so far as to impute to [the employee] some incapacity or lack of qualification to fill the position." *Kilgour v. Evening Star Co.*, 96 Md. 16, 24, 53 A. 716 (1902) (quoting *Sillars v. Collier*, 151 Mass. 50, 23 N.E. 723, 723 (1890)) (internal quotation marks omitted). Thus, if a supervisor's evaluation of an employee indicates that the employee is incapable or unqualified to do his or her job, and so exposes the employee to the hazard of losing that job, the evaluation may be defamatory *per se.* *See id.* at 23–24, 29, 53 A. 716; *Samuels v. Tschechtelin*, 135 Md.App. 483, 550, 763 A.2d 209 (2000).

■■■■ The letter that Mr. Scholl authored states, in substance, that Ms. Lewis is unable to sell Forest's products effectively and unable to behave professionally toward other employees. Pl.'s Opp'n, Ex. K. A salesperson without salesmanship ought not long remain in a company's employ. Indeed, the hazard to Ms. Lewis is clear. The letter warns that "[w]ithout immediate adjustment to [her] behavior, further disciplinary actions, including probation, will result." *Id.* The Court finds, as a matter of law, that the letter is capable of conveying a defamatory meaning. *See M & S Furniture Sales Co. v. Edward J. De Bartolo Corp.*, 249 Md. 540, 544, 241 A.2d 126 (1968) (reiterating that the court decides, in the first instance, whether a defamatory statement is actionable *per se*).

Mr. Scholl first published the letter by sending it to Mr. Sheldon for his review and approval. Scholl Dep. 266–67; Sheldon Dep. 100–01. When Mr. Sheldon endorsed the letter with a few modifications, he adopted its words as his own. Thus, when Mr. Scholl published the letter again by sending it to Ms. Williams, Mr. Sheldon published it as well.

A defamatory statement is false if the plaintiff proves that the gist or "sting" of the statement is false. *AIDS Counseling and Testing Ctrs. v. Group W Television, Inc.*, 903 F.2d 1000, 1004 (4th Cir.1990). Despite the inferior sales performance ranking of her sales territory, Ms. Lewis has forecast sufficient evidence that would permit a rational trier of fact to find that she remained a good salesperson. If sexu-

al harassment and/or retaliatory discrimination indeed taint the warning letter, its appraisal of her selling skills may well distort and misrepresent. *See supra.*

Once the plaintiff has demonstrated that defendants have published a false and defamatory statement, the defendants may assert a qualified, or conditional, privilege. *Gohari,* 363 Md. at 55, 73–74, 767 A.2d 321. A communication may be qualified when the occasion shows that the communicating party and the recipient have a mutual interest in the subject matter, and the communicating party reasonably believes that facts exist which the recipient is entitled to know. *Id.* at 57, 767 A.2d 321. Communications arising out of the employer-employee relationship clearly enjoy a qualified privilege. *Id.* at 56, 767 A.2d 321. Thus, when a supervisor issues a disciplinary notice to a subordinate employee, the supervisor generally enjoys a qualified privilege to publish the notice to others justifiably entitled to receive it. *See McDermott v. Hughley,* 317 Md. 12, 28–29, 561 A.2d 1038 (1989) (collecting cases). The publication at issue here is of precisely this sort, and the defendants have asserted their privilege.

A qualified privilege, however, affords but qualified immunity. Unlike the palladium of absolute privilege, its protection "is conditioned upon the absence of malice and is forfeited if it is abused." *Di Blasio v. Kolodner,* 233 Md. 512, 522, 197 A.2d 245 (1964). A statement is made with malice if made with knowledge of its falsity or with reckless disregard for the truth. *Marchesi v. Franchino,* 283 Md. 131, 139, 387 A.2d 1129 (1978). Demonstration that the defendants published the warning letter with malice thus renders them liable for defamation. And while the existence of a privilege is a question of law for the court, its forfeiture by malice is usually a question of fact for the jury. *Gohari,* 363 Md. at 63–64, 767 A.2d 321.

To demonstrate that Messrs. Scholl and Sheldon acted with malice, Ms. Lewis points to much the same evidence that she has adduced to demonstrate the falsity of the statement and the pretextual nature of the defendants' rebuttal of her *prima facie* case of discrimination. *See supra.* Thus, if sexual harassment and/or retaliatory discrimination taint the warning letter, its appraisal of her selling skills may well distort and misrepresent—maliciously. Both Mr. Scholl and Mr. Sheldon may have known that the letter contained untruths. The Court therefore cannot say as a matter of law that the evidence is insufficient to prove that the defendants have forfeited their qualified privilege.

If a statement is defamatory *per se,* and the plaintiff can demonstrate, by clear and convincing evidence, that defendants made the statement with malice, the law presumes damages. *Hearst Corp.,* 297 Md. at 125–26, 466 A.2d 486; *Samuels,* 135 Md.App. at 549–50, 763 A.2d 209. The plaintiff then need offer no proof of actual harm. *Hearst Corp.,* 297 Md. at 125–26, 466 A.2d 486; *Samuels,* 135 Md.App. at 549–50, 763 A.2d 209. The Court has already determined that the warning letter is defamatory *per se* and that a reasonable fact finder could conclude, at least by a preponderance of the evidence,[9] that

---

**9.** The Maryland Court of Appeals has not articulated the burden of proof that plaintiffs must meet to defeat a qualified privilege on the basis of malice. *See Marchesi,* 283 Md. at 139, 387 A.2d 1129 (defining the requisite malice in accord with the Supreme Court's definition in *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), but not indicating whether plaintiffs can overcome the privilege only if they prove it by clear and convincing evidence—as they must in order to recover pre-

Messrs. Scholl and Sheldon acted with malice. *See supra.* Viewing the facts and the reasonable inferences drawn therefrom in the light most favorable to Ms. Lewis, *see Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348, the Court further determines that Ms. Lewis could establish malice by clear and convincing evidence as well. Therefore, she need not prove damages, and Messrs. Scholl and Sheldon are not entitled to summary judgment on her claim of defamation.

■■■ The liability of Forest, if any, derives from the liability of its agent-employees. An employer is liable for the tortious act of its employees either: (1) if the act was within the scope of employment, *Sawyer v. Humphries*, 322 Md. 247, 255, 587 A.2d 467 (1991); or (2) if the employer subsequently ratifies the act, *Citizens Bank of Md. v. Md. Indus. Finishing Co.*, 338 Md. 448, 463 n. 9, 659 A.2d 313 (1995).

■■■ An employee's tortious conduct occurs within the scope of employment when the conduct is in furtherance of the business of the employer and is authorized by the employer. *Sawyer*, 322 Md. at 255, 587 A.2d 467. In addition, the harm complained of must be foreseeable. *Id.* at 256, 587 A.2d 467; *Cox v. Prince George's County*, 296 Md. 162, 171, 460 A.2d 1038 (1983). However,

> where an employee's actions are personal, or where they represent a departure from the purpose of furthering the employer's business, or where the employee is acting to protect his [or her] own interests, even during normal duty hours and at an authorized locality, the

employee's actions are outside the scope of his [or her] employment.

*Sawyer*, 322 Md. at 256–57, 587 A.2d 467. Conduct that is "unprovoked, highly unusual, and quite outrageous" may, in itself, indicate that the employee's motive was purely personal and the conduct outside the scope of employment. *Id.* at 257, 587 A.2d 467 (quoting Prosser and Keeton on the Law of Torts § 70, at 506 (W. Page Keeton et al. eds., 5th ed.1984)) (internal quotation marks omitted).

If Mr. Scholl wrote and published the warning letter, knowing it was false, because Ms. Lewis had rejected his sexual advances and/or because she had told him that she was going to file a complaint against him, he may have acted outside the scope of his employment. As the Supreme Court has recognized, a supervisor "acting out of gender-based animus or a desire to fulfill sexual urges may not be actuated by a purpose to serve the employer." [10] *Burlington Indus., Inc.*, 524 U.S. at 756, 118 S.Ct. 2257. Such motives appear "unrelated and even antithetical to the objectives of the employer." *Id.* at 757, 118 S.Ct. 2257; *see also Bleich v. Florence Crittenton Servs. of Balt., Inc.*, 98 Md.App. 123, 147–48, 632 A.2d 463 (1993) (Motz, J.).

Indeed, if Messrs. Scholl and Sheldon both published the letter knowing it was false, quite apart from any discriminatory or retaliatory super-motive, they may still have acted outside the scope of their employment. Intentionally issuing a false performance evaluation cannot, it would seem, further Forest's business interests. Quite the contrary. An employer relies on

---

sumed damages); *see also Gohari*, 363 Md. at 74, 767 A.2d 321; *Happy 40, Inc. v. Miller*, 63 Md.App. 24, 36–37, 491 A.2d 1210 (1985).

10. Employer liability in claims of sexual harassment under Title VII flows not from scope of employment principles, but from the "aided-by-agency-relation" principle enunci-

ated in the Restatement (Second) of Agency § 219(2)(d) (1958). *Faragher*, 524 U.S. at 802, 118 S.Ct. 2275; *Burlington Indus., Inc.*, 524 U.S. at 758–59, 118 S.Ct. 2257. The Maryland Court of Appeals, however, has not endorsed this theory of vicarious liability.

performance evaluations to identify both superior and inferior employees. Superior employees, the employer can then reward, thus encouraging them to serve even more diligently. Inferior employees, who retard the employer's business, the employer can either prod to improve or fire. Thus, no rational employer would authorize a supervisor deliberately to mis-evaluate. An employer that does so would, inevitably, punish competence and reward incompetence.

 Yet even if the defamatory conduct of Messrs. Scholl and Sheldon occurred outside the scope of their employment, Forest cannot escape liability because it later ratified what they had done. An employer can ratify the unauthorized act of its employee either by "a manifestation of an election . . . to treat the act as authorized" or by conduct that is "justifiable only if there were such an election." *Citizens Bank of Md.*, 338 Md. at 463 n. 9, 659 A.2d 313 (quoting Restatement (Second) of Agency § 83 (1958)) (internal quotation marks omitted). Valid ratification, however, requires knowledge of all the material facts undergirding the conduct at issue. *Lissau v. Smith*, 215 Md. 538, 546, 138 A.2d 381 (1958); *Huppman v. Tighe*, 100 Md.App. 655, 665, 642 A.2d 309 (1994). A ratified act has the same effect as if it had been authorized *ab initio;* ratification confers retroactive authority on the agent-employee. *Integrated Consulting Servs., Inc. v. LDDS Communications, Inc.*, 996 F.Supp. 470, 476 (D.Md.1998); Restatement (Second) of Agency § 218 (1958).

After Forest had completed its investigation of Ms. Lewis's complaint and had found Mr. Scholl's behavior "inappropriate" and "unprofessional," Defs.' Motion, Exs. U, BB, it nevertheless decided not to withdraw the warning letter. Its knowing retention of the letter manifests its intent to treat Mr. Scholl's allegedly defamatory evaluation of Ms. Lewis as authorized. Although early in August 2001, Forest proposed to remove the letter if a new division manager, via a ride-along with Ms. Lewis, independently found her performance satisfactory, Ms. Lewis declined the offer. *Id.*, Ex. Y. The letter remained in her personnel file. Forest has consistently believed it an accurate assessment of her skills and abilities.

Forest, therefore, is no more entitled to summary judgment on Ms. Lewis's defamation claim than Messrs. Scholl and Sheldon.

### D. *Tortious Interference with Economic Relationships*

Ms. Lewis claims that the warning letter interfered both with her at-will employment contract with Forest and with prospective employment contracts she might have entered with other employers. Pl.'s Compl. ¶¶ 84–85. The evidence, however, belies her claims.

 As to her employment with Forest, a party cannot tortiously interfere with its own economic relationships. *Travelers Indem. Co. v. Merling*, 326 Md. 329, 343, 605 A.2d 83 (1992). Maryland courts have never permitted recovery for the tort of interference with economic relationships "when both the defendant and the plaintiff were parties to the [relationship]." *Wilmington Trust Co. v. Clark*, 289 Md. 313, 329, 424 A.2d 744 (1981). Nor can a plaintiff recover against an agent of the defendant. *Pope v. Bd. of Sch. Comm'rs*, 106 Md.App. 578, 591, 665 A.2d 713 (1995); *Bleich*, 98 Md.App. at 147, 632 A.2d 463. "Thus, when . . . employee[s] act[ ] within the scope of [their] employment, or as . . . agent[s] of [their] employer, [they] cannot be held liable for interfering with the contract, business relationships, or economic relationships, between the employer and another." *Bleich*, 98 Md.App. at 147, 632 A.2d 463.

 Here, even if Messrs. Scholl and Sheldon were acting outside the scope of their authority when issuing the warning letter, Forest retroactively authorized their conduct by ratifying it. *See supra.* Therefore, they cannot be liable for interfering with the economic relationship between their principal-employer and Ms. Lewis. Nor, of course, can Forest itself be liable.

 As to any prospective economic relationships, Ms. Lewis has adduced no evidence that she has lost any employment opportunity outside Forest because of the letter. Lewis Dep. 605–06. Moreover, there is no evidence that Forest has even disclosed the warning letter to anyone outside Forest. *Id.* at 606. Without proof of actual loss or damage, Ms. Lewis's tortious interference claim must fail. *See Alexander & Alexander, Inc. v. B. Dixon Evander & Assocs.,* 336 Md. 635, 652, 650 A.2d 260 (1994).

E. *Wages Due*

Finally, Ms. Lewis claims that Forest failed to pay her various wages in violation of the WPCL. In particular, she claims that she was not paid her salary during her leave of absence, her vacation pay upon the termination of her employment, and her bonus and commission for the quarter dated October through December 2000.

Per company policy (and as common sense dictates), Forest does not pay any compensation to employees on leave of absence, inasmuch as they are not doing any work. Defs.' Motion, Ex. X. Nevertheless, in spring 2001, Forest advanced Ms. Lewis almost $8,000 in an "attempt[ ] to assist [her] during [her] leave and recovery." *Id.* It had no obligation to do so. Even after Ms. Lewis refused to return to work and Forest discharged her, Forest never requested that she return any of the funds advanced.

Regarding vacation pay, both parties agree that Ms. Lewis had accrued twenty days of vacation at the time she was fired. Lewis Dep. 368–70; Williams Dep. 203–07. Forest has asserted that it paid Ms. Lewis the full amount due for those twenty days. Williams Dep. 207. Although Ms. Lewis believes that Forest somehow underpaid her, she has pointed to no evidence that might support her belief. And mere belief, however fervent, the law discounts.

Finally, Forest's payroll records indicate that Ms. Lewis was paid the bonus and commission she complains she never received. Defs.' Motion, Ex. GG. No evidence suggests otherwise.

In sum, Forest has paid Ms. Lewis all the compensation due her. She cannot recover what she is not owed.

*CONCLUSION*

For the foregoing reasons, a separate order will be issued: GRANTING defendant Forest's motion for summary judgment as to Counts I/II (Sexual Harassment) and I/II (Retaliation), with respect to the termination of employment; DENYING defendant Forest's motion for summary judgment as to Count I/II (Sexual Harassment), with respect to the hostile work environment, the warning letter, and the denial of promotion; DENYING defendant Forest's motion for summary judgment as to Count I/II (Retaliation), with respect to the warning letter and the denial of promotion; GRANTING defendant Forest's motion for summary judgment, and entering judgment in its favor, as to Count III; DENYING the defendants' motion for summary judgment as to Count IV; GRANTING the defendants' motion for summary judgment, and entering judgment in their favor, as to Count VII; DISMISSING Counts VIII and IX

with prejudice; and GRANTING defendant Forest's motion for summary judgment, and entering judgment in its favor, as to Count X.